# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SANTOS ALBERT, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | )    2:21-cv-01625 |
| v. | ) |
| | ) |
| ALLEGHENY HEALTH NETWORK, | ) |
| | ) |
| Defendant. | ) |

## OPINION

**Mark R. Hornak, United States District Judge**

This is an employment discrimination case. Plaintiffs Santos Albert and John Guthrie used to work for Defendant Allegheny Health Network ("AHN"). Plaintiff Santos Albert, who is Black, claims that he was subjected to unlawful workplace discrimination because of his race, that he was subjected to a hostile work environment because of his race, and that he was retaliated against for his opposition to unlawful discriminatory behavior. Because of all this, Albert argues that AHN is liable to him under Title VII, Section 1981, and the Pennsylvania Human Relations Act ("PHRA").

For his part, Plaintiff Guthrie, who is white, claims that he was unlawfully discriminated against because of his association with Albert, that he was subjected to a hostile work environment because of his association with Albert, and that he was retaliated against for his opposition to unlawful discriminatory behavior. Guthrie argues that AHN is liable to him under Section 1981.

The parties have filed dueling motions for summary judgment. These motions are fully briefed and ripe for resolution. For the reasons discussed below, Plaintiffs' Partial Motion for Summary Judgment will be denied. Defendant's Motion for Summary Judgment will be granted in part and denied in part.

I.      **Factual Background**

The parties' briefs and submissions are extensive and the history of the Plaintiffs' work at AHN is filled with many twists and turns, many but not all of which are material to the matters now before the Court, so it is important to lay out many of the underlaying facts in the record before the Court (and the reasonable inferences that may be drawn from them) with more than the usual level of detail.

Allegheny Health Network is one of Western Pennsylvania's largest hospital systems. It is also one of the region's largest employers. Like other hospital systems, AHN has a call center to help patients schedule appointments and manager their care, called "Care Connect." (ECF No. 121 ¶ 3).[1] In 2013, AHN hired Diane Allen to be the Director of the Care Connect. (ECF No. 117 ¶¶ 1–2).[2] According to Allen, she built Care Connect from the ground up, starting with just her and five empty desks. (Allen Dep. 30:13-25, ECF No. 100-1 at 10). Within several years, Care Connect had grown to several hundred employees. (Allen Dep. 30:18-25, ECF No. 100-1 at 10).

In 2015, Allen hired John Guthrie as an Operations Manager. (ECF No. 121 ¶ 4). In this role, Guthrie was responsible for managing day-to-day operations, overseeing training and recruiting, and making sure that calls were being answered. (ECF No. 117 ¶ 7). Around the same time, Allen also hired Janet Constantin, a white woman, into a manager-level position. (ECF No. 117 ¶ 7; Constantin Dep. 163:2, ECF No. 101-1 at 43). Allen and Constantin became good friends. (ECF No. 117 ¶ 9).

Two years later, in 2017, Allen asked Guthrie to reach out to Santos Albert about coming to work at AHN. (Guthrie Dep. 95, 106:14-18, ECF No. 100-2 at 26, 29). Guthrie and Albert had

---

[1] The document at ECF No. 121 is Plaintiffs' Response to Defendant's Statement of Material Facts.

[2] The document at ECF No. 117 is Defendant's Response to Plaintiff's Statement of Material Facts.

previously worked together at a company called Ibex Global. (ECF No. 117 ¶ 10). Though the two had "very rarely" worked together at Ibex, Guthrie thought highly of Albert's work. (ECF No. 117 ¶ 10). Albert applied, was interviewed, and was hired as an Operations Supervisor in January 2017.[3] (ECF No. 117 ¶ 14). Allen was one of the decision-makers, and she knew that Albert was Black when she hired him. (ECF No. 121 ¶¶ 16-17). According to Allen's uncontroverted deposition testimony, Allen hired Albert over at least two white candidates. (ECF No. 121 ¶ 18).

Albert's employment got off to a rocky start. As Albert tells it, Allen had made certain promises to him during the interview process on which she did not follow through. First, Albert had expressed concern that he was leaving a manager-level position to take a supervisor-level position at AHN. (Albert Dep. 64:13-20, ECF No. 100-3 at 18). According to Albert, Allen told him that would be promoted before "a long time[,] . . . possibly 60 to 90 days" once he got settled in. (ECF No. 117 ¶ 14; Albert Dep. 64:13-20, ECF No. 100-3 at 18). Despite this, Albert was not promoted to a manager-level position until January 2018, about a year in, but promoted he was. (ECF No. 121 ¶ 19). Albert testified that he did not know whether there was a manager-level vacancy during his first 60 to 90 days nor whether any other supervisor was promoted to a manager-level position during that period. (Albert Dep. 65:4-10, ECF No. 100-3 at 18). As we will see below, there was not on either front.

Second, according to Albert, Allen had led him to believe that he would receive "full" training and onboarding, but he was pulled out of training early. (ECF No. 117 ¶ 15). Though Albert participated in a one-week onboarding, he did not receive structured training on how to schedule appointments. (Albert Dep. 67:4-16, ECF No. 100-3 at 19). Despite not receiving that

---

[3] AHN's personnel structure includes the following titles in decreasing levels of seniority: Senior Vice President, Vice President, Director, Manager, Supervisor.

training, Albert taught himself how to do the tasks at issue within a couple months. (Albert Dep. 68:12-20, ECF No. 100-3 at 19).

And third, according to Albert, Allen had apparently promised him the 8:00 AM to 4:30 PM work shift, only to then require him to work a later shift once hired. (ECF No. 117 ¶ 15). He says that this earlier shift was actually "given" to a white employee, but as we'll see below, that employee was already working that shift when Albert was hired. (*Id.*).[4]

That's not all. According to Albert, shortly after starting, he began to hear Allen make disparaging comments, which Albert perceived as racially charged. Albert testified that in March 2017, he saw Allen pick up a picture of an employee's husband and say, "Look at this garbage, I thought she was a nice girl." (ECF No. 117 ¶ 22). According to Albert, the employee in question was white, and her husband was Black. (Albert Dep. 78:12-80:12, ECF No. 100-3 at 22). On another occasion, Allen told Albert that he needed to get his "monkeys" in line and used the expression, "not my circus, not my monkeys." (ECF No. 117 ¶ 23).

Albert also alleges that during these early months, he was subjected to excessive workplace scrutiny. He (and Guthrie) testified that Allen and Constantin would stand outside in the parking lot and watch Albert work at his desk, (ECF No. 117 ¶ 48); that Allen would also ask Guthrie about Albert's whereabouts, (ECF No. 117 ¶ 17); and that another employee would monitor the times that Albert arrived at work, (ECF No. 117 ¶ 17). On one occasion, according to both Albert and Guthrie, Allen, Albert, and Guthrie discussed the allegations that Albert was late to work. During this conversation, Allen told Guthrie, "You better get your boy in line," with "boy"

---

[4] Albert's testimony that he was promised the early shift without qualification, (Albert Dep. 66:13-16, ECF No. 100-3 at 19), is in tension with Guthrie's testimony that Albert was "brought in with an understanding if he put in his time, took calls, worked the late shift, that he was going to be promoted," (Guthrie Dep. 99:5-9, ECF No. 100-2 at 27).

4

referring to Albert. (ECF No. 117 ¶ 18). Albert's attendance and punctuality continued to be a point of contention in this litigation. (*See, e.g.*, ECF No. 117 ¶ 42).

In September 2017, Allen was promoted to a Vice President of Care Connect Operations, and she subsequently promoted Guthrie and Constantin to director-level positions. (ECF No. 117 ¶ 24; ECF No. 121 ¶ 26). AHN then looked to fill Constantin's former manager-level position. (ECF No. 117 ¶ 25). Albert applied. (*See* ECF No. 121 ¶¶ 19–21). Allen, Guthrie, and Constantin were all on the panel that considered the finalists, though Allen had final decision-making authority. (ECF No. 117 ¶ 26). According to Guthrie, Allen was initially opposed to promoting Albert and required him to go through an atypically strenuous interview process, but after Albert performed well during his interview, Allen selected Albert for the role. (ECF No. 117 ¶¶ 27, 29). According to Allen, Albert was promoted over six other candidates, most of whom were white. (ECF No. 121 ¶ 21). Whatever the circumstances, Albert received this promotion, with its accompanying pay raise, in January 2018. (ECF No. 121 ¶¶ 19, 22). At this point, Albert was the only Operations Manager within the Care Connect. (ECF No. 121 ¶ 24).

One other thing of note happened during the interview process. According to Guthrie, during the interview process, he, Allen, and Constantin interviewed two comparable candidates back-to-back. (ECF No. 117 ¶ 28). The candidates had comparable skills; one was white, and the other was Black. (ECF No. 117 ¶ 28). After interviewing both, Allen allegedly ripped up the resume of the Black candidate. (ECF No. 117 ¶ 28).

At year's end, Allen apparently expected managers—including Albert—to get their teams holiday gifts to keep morale high. (Guthrie Dep. 183:3-22, ECF No. 100-2 at 48). Fearing that Albert would not have the funds to do so and wanting to shield Albert and himself from criticism, Guthrie purchased gift cards for Albert to distribute to his Albert's team. (Guthrie Dep. 183:17-

22, ECF No. 100-2 at 48). At the end of 2018, Albert did not receive a bonus, but Guthrie and Constantin—employees at a level above Albert—did. (ECF No. 117 ¶ 40).

Albert says that things did not get better in 2019. Early that year, Allen started requiring Albert to attend 6:00 AM meetings with the orthopedic group. (ECF No. 117 ¶ 41). Though Allen and Constantin were also invited to these early-morning meetings, Allen told Albert that he should attend because he was the most knowledgeable person on the topics that would be discussed. (ECF No. 117 ¶ 41; Albert Dep. 248-49, ECF No. 100-3 at 64). Albert disputes that he was the most knowledgeable. (Albert Dep. 248-49, ECF No. 100-3 at 64).

By spring of that year, Plaintiffs claim that things had reached a tipping point with Allen. Guthrie and Albert complained to Jami Tinney, a Senior Human Resources Business Partner, about Allen's abusive and disparaging conduct. (ECF No. 117 ¶ 53). Albert and Guthrie say they first reached out in March (ECF No. 117 ¶ 53). AHN disputes this. (ECF No. 117 ¶ 53). But whether or not Guthrie and Albert contacted Tinney in March, they certainly did so in May. On May 1, 2019, Guthrie complained to Tinney about Allen's management style and unprofessional interactions with her employees. (ECF No. 121 ¶¶ 30–31). Guthrie reported that Allen "very frequently uses foul, rude and derogatory language." (ECF No. 121 ¶ 31). After receiving this complaint, Tinney interviewed other members of the management team—Xander Goldberg, Jessica Johnson, Anthony Morelli, and Albert—each of whom reported negative experiences with Allen. (ECF No. 121 ¶¶ 34–37). Summarizing their complaints, Tinney wrote, "Diane [Allen] rules by bullying and threatening people with being fired." (Def.'s Ex. A, AHN000704, ECF No. 118-1 at 9). Tinney believed "that these comments do hold a high merit of truth," noted that the team's comments were consistent with her own interactions with Allen and felt that human resources needed to intervene. (Def.'s Ex. A, AHN000704, ECF No. 118-1 at 9). While Tinney was

concerned about Allen's bullying, she also testified that these employees did not tell her that Allen's comments or conduct was related to race. (ECF No. 121 ¶ 40).

On May 10, 2019, before HR could act on the previous complaints, Allen made the comment that would ultimately get her fired. In a meeting with the managers who reported to her, Allen was telling her team how she was butting heads with an employee of AHN's parent company. At some point during this, Allen said something along the lines of "who are they going to believe, us or a nasty, lying black woman." (ECF No. 117 ¶ 59; ECF No. 121 ¶ 41; Pls.' Ex. 44, AHN000701, ECF No. 106-2). Four of the seven people at the meeting—Guthrie, Albert, Goldberg, and one other—reported the comment to Tinney. (ECF No. 117 ¶ 59). Guthrie also told Tinney that this was not the first time that Allen used racist language. (ECF No. 121 ¶ 42). He told her about one instance in mid-2018 when Allen had called former Pittsburgh Steeler Le'Veon Bell a "n*****" while Guthrie, Allen, and Constantin were driving to a meeting together. (ECF No. 121 ¶¶ 41–43). Allen and Constantin deny that Allen made this comment. (ECF No. 121 ¶¶ 44–45).

Tinney escalated the situation to her superiors, and it was ultimately referred to Mary Esgro, AHN's Director of Employee and Labor Relations, to investigate the incident. (ECF No. 117 ¶ 59). Allen was not suspended during the pendency of the investigation. (ECF No. 117 ¶ 61). Esgro's investigation yielded allegations that Allen made numerous other abusive and discriminatory statements. (ECF No. 117 ¶ 67). Ultimately though, after substantiating Allen's May 10 comment, Esgro did not investigate these other instances further because Kenyokee Crowell, the Senior Vice President and Allen's direct manager, decided to terminate Allen's employment on the basis of her May 10 comment. (ECF No. 121 ¶¶ 54–55). Allen's employment with AHN was terminated on May 30, 2019. (ECF No. 121 ¶ 57). Esgro testified that AHN had

7

not received complaints that Allen was engaged in racial discrimination or harassment before May 10. (ECF No. 121 ¶ 50).

While not all of the following was revealed by AHN's investigation, (*see* ECF No. 117 ¶ 67), the record produced in this litigation contains evidence that Allen made other derogatory and unprofessional statements about and towards her employees while she worked at AHN. According to Plaintiffs, Allen teased Albert for shopping at K-Mart and Walmart, saying that it was "ghetto," (Albert Dep. 107:9-17, ECF No. 100-3 at 29); Allen commented, "with a name like that . . . don't bring them in," after receiving an application from a candidate named "Chiquita," (ECF No. 117 ¶ 33); Allen told employees not to "cross her," (ECF No. 117 ¶ 45); Allen made disparaging comments about her employees' intelligence, (ECF No. 117 ¶ 55); Allen told men that she would put their "balls through a meat grinder" or "wear their balls as a necklace" if they made mistakes, (ECF No. 117 ¶ 39); Allen made derogatory comments about employees' weight and ability, (ECF No. 117 ¶¶ 43, 47); Allen suggested that an employee's medical emergency was caused by drugs, (ECF No. 117 ¶ 47); and Allen told an employee whose daughter was going to be a single mother, "there you go, there's another welfare baby," after learning that the baby would be biracial, (ECF No. 117 ¶ 46). At his deposition, Albert testified that Allen told him that he and another employee were "good blacks, not n*****s," (ECF No. 117 ¶ 57), and that, in April 2019, she called a person of Middle Eastern descent a "sand n*****," (ECF No. 117 ¶ 56). At his deposition, Guthrie testified that Allen stumbled over this person's name and called him a terrorist but he could not corroborate the "sand n*****" comment. (ECF No. 117 ¶ 56). According to Guthrie, this incident took place in 2018. (ECF No. 117 ¶ 56).

The record contains evidence that, in terms of workplace interactions, Plaintiffs had their own issues with their professional deportment. Though to a lesser extent and temperature, Guthrie

participated in some inappropriate banter with Allen. (*See* ECF No. 117 ¶ 44). Further, after Allen's departure, Constantin began receiving complaints from other employees about Albert and Guthrie. Constantin testified that other employees reported to her that "John and Santos were screaming at them and people felt intimidated and harassed and fearful." (Constantin Dep. 77:6-8, ECF No. 101-1 at 21). Constantin testified about at least three specific instances. In one, an employee named Merica reported to her that she felt "fear and intimidation in conversations with Santos" and that she was "very uncomfortable about it." (Constantin Dep. 78:23-79:11, ECF No. 101-1 at 22). In another, an employee named Ramona complained that Albert had followed her down a hallway. (Constantin Dep. 83-84, ECF No. 101-1 at 23). And in the third, an employee Kim Stoyanoff reported to Constantin that Guthrie questioned her about her use of FMLA leave. (Constantin Dep. 84-85, ECF No. 101-1 at 23). Constantin reportedly passed these complaints along immediately to Crowell, who was her supervisor and the Senior Vice President in charge of the Care Connect. (ECF No. 117 ¶ 73; Constantin Dep. 87:7-13, ECF No. 101-1 at 24). Though Crowell could not remember exactly when, she testified that these complaints about Albert and Guthrie started around two to three months after Allen's departure. (Crowell Dep. 212:21-25, ECF No. 101-2 at 55). Albert and Guthrie contend that these complaints were made by employees loyal to Allen in retaliation for Albert and Guthrie's role in getting Allen fired.

In September 2019, Crowell and Colleen Chmiel—a "Talent Engagement Partner"— discussed requiring Guthrie and Albert to participate in a leadership training program. (ECF No. 121 ¶ 62; Def.'s Ex. A, AHN001624-25, ECF No. 118-1 at 60-61). Guthrie was slated to participate in this program because of an incident that summer where he had inappropriately addressed one of his subordinates. (Pls.' Ex. 46, AHN001695, ECF No. 106-4). According to an email from Crowell to Chmiel, Albert had previously expressed to Crowell that he knew that

"message delivery and tone is something he needs to improve on." (Pls.' Ex. 47, AHN001618, ECF No. 106-5).

Throughout the fall of that year, complaints against Albert and Guthrie continued. In November 2019, one of Albert's employees, Kimberley Stoyanoff, submitted a complaint through AHN's HR portal, alleging that Albert had questioned her about her use of FMLA leave and that she witnessed Albert "not support Merica during a meeting [to] the point she broke down since they called her out in front of her peers." (Def.'s Ex. A, AHN 001150, ECF No. 118-1 at 35). Around the same time AHN's HR department also received anonymous complaints about Albert and Guthrie. (ECF No. 117 ¶ 78). Chmiel determined that these anonymous complaints were not actionable, however, because they were "blanketed statements about the environment or leadership but no dates/times/incidents to note and address." (Pls.' Ex. 46, AHN001695, ECF No. 106-4).

This was the state of things when AHN hired Melissa Turner to replace Allen as Vice President of Care Connect Operations. Turner started on November 18, 2019. (ECF No. 121 ¶ 61). In this role, she was Guthrie's direct supervisor. (ECF No. 121 ¶ 66). According to Turner, within a few weeks of arriving, she became aware of issues with Guthrie and Albert's performance. According to Turner, she noticed that Guthrie was at times unprofessional and that Albert failed to communicate clearly and missed deadlines and meetings. (ECF No. 121 ¶ 63). Turner also testified that she received complaints from other employees about their interactions with Guthrie and Albert, (ECF No. 121 ¶ 64), and that she was also warned to "watch her back" around them, (ECF No. 117 ¶ 87).

Around this time, Crowell also decided to bring in an external consultant to help address some of the call center's continuing workplace issues. (ECF No. 117 ¶ 76). According to Crowell, even after Allen's departure, team members—specifically Guthrie and Albert—were "struggling

with poor behavior" and "poor leadership habits," including verbal abuse, poor communication, and preferential treatment. (Crowell Dep. 207:24-209:9, ECF No. 101-2 at 54). These consultant-driven "Blue Sky" sessions were intended to address these issues, though some AHN employees perceived them as an effort to "paper over" the issues that Allen's leadership had caused. (ECF No. 117 ¶ 77). The circumstances of Allen's departure came up during these sessions, if only briefly. (Goldberg Dep. 149-150, ECF No. 100-4 at 39-40). Turner participated in some of these sessions. (Goldberg Dep. 151:5-9, ECF No. 100-4 at 40).

Turner tried to address her concerns about Albert's performance directly and through Guthrie, who at that point was Albert's direct supervisor. (ECF No. 121 ¶¶ 67, 69). For example, on January 3, 2020, Turner spoke with Albert about his communication, instructing him that he should not use works like "backstabbing" and "sabotage." (ECF No. 121 ¶ 69). Guthrie had also provided Albert with feedback on how others perceived his communication style. (ECF No. 121 ¶ 68).

Even compared to the novel-like tale of workplace activities set out above, the parties' accounts of the events immediately leading up to the termination of Guthrie's employment diverge significantly. As AHN tells it, on January 22, 2020, Turner emailed Guthrie a bulleted list of concerns she had with Albert's performance. (ECF No. 121 ¶ 70). Turner noted concerns about Albert's leadership style ("demotivating and feelings of devaluing employees"), his lack of communication, his use of inappropriate language, his failure to follow up on a particular task, his failure to meet a particular deadline, his missing a particular meeting, and "your [i.e., Guthrie's] concerns which were brought to me in early December." (Def.'s Ex. A, AHN001623, ECF No. 118-1 at 59).

Turner wrote that Albert was "not operating at a manager level or with the experience he had," and she asked Guthrie to prepare formal talking points for Albert that included "areas of improvement" and "specific items" for improvement. (ECF No. 121 ¶¶ 70–71). Turner instructed Guthrie that these talking points should be vetted by her and Chmiel before they were communicated to Albert. (Def.'s Ex. A, AHN001940-41, ECF No. 118-1 at 92–93). Guthrie emailed back, "I will review and get a draft to you by Friday if that works?" (Def.'s Ex. A, AHN001940, ECF No. 118-1 at 92). On that Friday, January 24, Guthrie emailed again saying that he was drafting the talking points and would talk with Chmiel later that day. (ECF No. 121 ¶ 75). Hours later, Turner responded that she believed that "this could be more of a conversation that is just documented on your end." (Def.'s Ex. A, AHN001939, ECF No. 118-1 at 91).

After Turner followed up on January 29, Guthrie told her that he had "connected with Colleen yesterday on this" and would "provide the notes and actions today." (ECF No. 121 ¶ 77). Turner then reached out directly to Chmiel, forwarding some of the emails between Turner and Guthrie, to ask if she had connected with Guthrie about Albert. Chmiel said they had not. (ECF No. 121 ¶¶ 78–79).

That same day, Chmiel and Turner determined to terminate Guthrie's employment "for insubordination, lying to his supervisor, and breaching trust." (ECF No. 121 ¶ 83). Turner had instructed Guthrie to have multiple conversations with Albert. (ECF No. 124 ¶ 5). Guthrie avoided having these conversations and did not follow through on Turner's directive to prepare talking points for Albert. (ECF No. 121 ¶ 81). Further, as Chmiel and Turner saw things, by saying that he had "connected with Colleen yesterday on this," Guthrie lied to them. (ECF No. 121 ¶ 80). The next day, on January 30, Turner and Chmiel had a meeting with Guthrie at which they confronted him about his misrepresentation, and according to Chmiel, Guthrie admitted that he "shouldn't

have done that." (ECF No. 121 ¶ 82). Guthrie was suspended that day, and his employment was terminated effective February 3, 2020. (ECF No. 117 ¶ 119; ECF No. 121 ¶ 84).

Guthrie does not dispute many of those basic facts, but, by his telling, AHN's account is materially incomplete. According to Guthrie, during the conversation that Turner's January 22 email purported to summarize, Guthrie contradicted Turner's claims about Albert's performance and expressed that he felt that Albert was unfairly being singled out. (ECF No. 117 ¶¶ 98–100). He averred that he talked Turner out of taking "corrective action" against Albert, and they settled on "documented coaching" instead. (ECF No. 117 ¶ 98). Notwithstanding this prior conversation, Guthrie admits that he was asked via email to draft "formal talking points," that he agreed to do so, and that he did not express opposition or disagreement to doing so in his emails to Turner. (ECF No. 117 ¶ 101; ECF No. 121 ¶ 73).

Further, Guthrie averred that after they exchanged emails on January 29, he and Turner had another conversation during which Turner told him to "formally discipline" Albert. (ECF No. 124 ¶¶ 15–17). Guthrie refused, explaining that he believed Albert was being treated more harshly than the white members of the leadership team and providing specific examples of this disparate treatment. (ECF No. 124 ¶¶ 15–19). In Guthrie's retelling, after this conversation, Turner forwarded an incomplete thread of emails to Chmiel to create the appearance that Guthrie had been asked to formally discipline Albert. (ECF No. 117 ¶¶ 105–06). Finally, though he admits that he and Chmiel did not have a substantive discussion about Albert, he says that Albert did come up in his conversation with Chmiel on January 28. (ECF No. 117 ¶ 120). Guthrie agrees that he was suspended on January 30, and his employment was terminated on February 3. (ECF No. 117 ¶ 131). It is not clear whether Guthrie received a termination letter. (ECF No. 117 ¶ 129).

A few weeks after Guthrie's employment was terminated, Chmiel and Jamie Lusty—another employee in AHN's HR department—exchanged emails over whether AHN should contest Guthrie's eligibility for unemployment benefits. (ECF No. 117 ¶ 163). Chmiel wrote, "Yes he was discharged for cause but how egregious was it and if given the benefit does it result in lessoning [sic] the possibility of a lawsuit." (ECF No. 117 ¶ 163).

After Guthrie's employment was terminated, Turner's attention allegedly returned to Albert. Earlier in January, AHN had received an anonymous complaint that accused Albert of using "abrupt, inappropriate, derogatory, and . . . foul language." (Def.'s Ex. A, AHN001198, ECF No. 118-1 at 44). HR started looking into this.

On February 3, the same day that Guthrie's employment was terminated, Turner asked Chmiel if she had any updates on this investigation. (Def.'s Ex. A, AHN01810, ECF No. 118-1 at 80). Turner also mentioned that there was "some weirdness" that she wanted to discuss with Chmiel. (Def.'s Ex. A, AHN01810, ECF No. 118-1 at 80). Chmiel reported that Mike Webber, a member of AHN's HR department, had investigated the complaint, but no one was willing to take ownership of it. (Def.'s Ex. A, AHN01810-11, ECF No. 118-1 at 80–81). Chmiel also texted, "I think a PIP [performance improvement plan] is less risky for us anyway." (Def.'s Ex. A, AHN01812, ECF No. 118-1 at 82).

A couple days later, seemingly after investigating that "some weirdness" involving the operations group, Turner asked Chmiel, "There's no way to just cut ties with this group right? Cause I feel like core values is non existent here. Sigh." Chmiel responded, "There is the risk of being sued for wrongful termination. We need documentation to show why or that we set clear expectations and they still did not meet them. Unfortunately we can't just term." (Def.'s Ex. A, AHN01819, ECF No. 118-1 at 89).

On February 7, Turner reached out to an employee who had previously complained about Albert to see if things had better or worse with her interactions with Albert; she was told things had gotten better. (Pls.' Ex. 27, AHN001350, ECF No. 104-4). At some point, Turner also apparently solicited information about Albert (and Guthrie) from other employees, though the timing of these other solicitations is not clear. (ECF No. 117 ¶ 144). Also on February 7, Turner met with Albert to discuss his 2019 performance review. (ECF No. 121 ¶ 85). Though he received a positive review from Crowell, Albert received an off-track rating for the section "Trust Working Together." (ECF No. 117 ¶ 104; ECF No. 121 ¶ 86).

About a week later, on February 13, Albert was placed on a 30-day Performance Improvement Plan ("PIP"), which identified the following as areas as needing improvement: (1) managing delivery of feedback; (2) ensuring requests are appropriately acknowledged; (3) treating colleagues with respect; (4) completing the transformational leadership training; and (5) demonstrating core behaviors and leading by example. (ECF No. 121 ¶ 89). The PIP also stated that failure to meet expectations could lead to disciplinary action including termination of employment. (ECF No. 121 ¶ 90). Albert has testified that in the meeting in which he was told about the PIP, Turner told him that she doesn't care what the other staff does, and that when it comes to him, she needed "zero errors, no mistakes." (ECF No. 117 ¶ 154). Albert disagreed with the criticism of his work, (ECF No. 117 ¶ 157), and was not alone: some of Albert's coworkers thought he was good at his job too. (*See, e.g.*, ECF No. 117 ¶¶ 10, 20, 144).

The same day that Albert was placed on a PIP, Turner received a call from Kelly Kwasnieski—a direct report of hers—with some troubling information about Albert. According to Kwasnieski, a manager that Kwasnieski supervised, Jeff Fielder, had heard Albert bragging about getting people fired and that he would "play the race card" as a last resort. (ECF No. 121 ¶ 92).

Fielder expanded on his concerns in an email to Crowell. Specifically, he noted an example where one of Albert's employees came to him for help because she was scared to go to Albert; an example where Albert came off as a bully and said "that wants me to retaliate" after someone complained about his tone; and an example where Albert said, there were "evil forces at work at the call center." (Def.'s Ex. A, AHN000710-11, ECF No. 118-1 at 12–13).

Only a few days after Albert was placed on a PIP, AHN received anonymous complaints against Turner. In the first, the complainant accused Turner of "making disciplinary decisions based on sex and race" and using "inappropriate language and gestures." (ECF No. 117 ¶ 160). The complainant also said that they had heard Turner say, "if you were smarter and white you wouldn't struggle so much with your time." (ECF No. 117 ¶ 160). In the second, the complainant accused Turner of using the term "n*****" and "lowlife" when discussing "our" manager (presumably Albert). (ECF No. 117 ¶ 162).

On March 6, 2020, Jessie Pfalzgraf—another person from AHN's HR department—called Albert to ask him about these anonymous complaints. Albert told Pfalzgraf that he had never heard Turner make racist remarks, and as a result, Pfalzgraf determined that the complaint was unsubstantiated and recommended closing the investigation. (ECF No. 117 ¶ 164). While Albert told Pfalzgraf that he had never heard Turner make racist remarks, he testified at his deposition that he overheard Turner refer to him as a diversity hire later that month. (ECF No. 117 ¶¶ 164, 167).

Albert's PIP was scheduled to end on March 13, but it was extended because Albert was on extended medical leave. (ECF No. 117 ¶ 156). Turner testified that throughout the PIP period, she provided Albert with coaching, but as of April 7, she still had concerns about Albert's performance and conduct. In an email to Chmiel that day, Turner noted that he was "not performing

at a management level and I am doing the majority of his work." (Def.'s Ex. A, AHN001692-93, ECF No. 118-1 at 66-67). She also listed specific concerns with Albert's performance. (Def.'s Ex. A, AHN001692-93, ECF No. 118-1 at 66-67). According to Turner, she concluded that Albert didn't meet the expectations outlined in the PIP and, in consultation with Chmiel and Lusty, decided to terminate his employment on that basis. (ECF No. 121 ¶ 96; Def.'s Ex. A, AHN001691-93, ECF No. 118-1 at 65-67). Turner prepared a termination letter that explained that Albert's employment was being terminated because his performance was not satisfactory and because he failed to meet the expectations outlined in his PIP. (ECF No. 121 ¶ 98). Albert's employment was terminated effective April 10, 2020. (ECF No. 121 ¶ 99). As of that time however, Turner had not completed the evaluation grids in the PIP. (ECF No. 117 ¶¶ 171-72).

Throughout all of this, AHN maintained formal policies against harassment, discrimination, and retaliation. (ECF No. 121 ¶ 1). AHN also maintained a policy on corrective action that provided that managers should take "progressive action" to address performance deficiencies. (ECF No. 117 ¶ 182). Under this policy, managers should start with more informal methods of correction, such as counseling or oral warnings, before moving on to more severe steps like "documented coach[ing] and counsel[ing]," "verbal written warning[s]" "written warnings," performance improvement plans, or termination. The policy also provides, however, that managers can skip any intermediate steps, including moving straight to termination of employment, if the circumstances warrant such action. (ECF No. 117 ¶ 182).

## II.    Legal Standards

### A.    Summary Judgment Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A dispute is "genuine" if there is a "sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006). And a fact is material if it might affect the outcome of the suit. *Id.*

In deciding whether to grant summary judgment, it is not a court's role to weigh the evidence or to make credibility determinations. *Boyle v. Cnty. of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998). Rather, the court must view the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If there is a conflict between the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

In every case, the movant bears the initial responsibility for establishing that summary judgment is proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the movant bears the burden of proof at trial, they must demonstrate that the evidence in the record is so overwhelming and so uncontroverted that a reasonable jury would be compelled to find in its favor. *See El v. Se. Pa. Transp. Auth. (SEPTA)*, 479 F.3d 232, 238 (3d Cir. 2007). Where the non-movant bears the burden of proof at trial, the movant's initial burden can be met by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. Once the movant has met their initial burden, the party resisting summary judgment may not rely "merely upon bare assertions, conclusory allegations or suspicions." *Fireman's Ins. Co. v. Dufresne*, 676 F.2d 965, 969 (3d Cir. 1982). Rather, they must go beyond their pleadings and point to specific facts in the record demonstrating that there is in fact a genuine issue of material fact. *Celotex*, 477 U.S. at 324.

The summary judgment standard does not change "in the context of cross-motions for summary judgment." *Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987). Where, as here, both parties move for summary judgment, the court must determine whether either party is entitled to judgment in accordance with the Rule 56 standard. *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016).

### B.    Race Discrimination

Where there is no direct evidence of discrimination, the *McDonnell Douglas* burden-shifting framework provides a means of analysis of discrimination claims under Section 1981, Title VII, and PHRA. *Castleberry v. STI Group*, 863 F.3d 259, 263 (3d Cir. 2017); *Atkinson v. LaFayette Coll.*, 460 F.3d 447, 454 n.6 (3d Cir. 2006) ("Claims under the PHRA are interpreted coextensively with Title VII claims."). Under this framework, the plaintiff must first establish a prima facie case of discrimination. To do this, a plaintiff must generally show:

(1) he was qualified for the position he occupied, and
(2) he was subject to an adverse employment action
(3) under circumstances that give rise to an inference of unlawful discrimination.

*See In re Tribune Media Co.*, 902 F.3d 384, 402 (3d Cir. 2018).[5] At trial, the plaintiff will need to establish their prima facie case by a preponderance of the evidence, *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 252-53 (1981), but the plaintiff need not do so at summary judgment. Rather, to prevent summary judgment for the defendant, the plaintiff must proffer evidence that

---

[5] Consistent with earlier cases, *In re Tribune Media Co.*, 902 F.3d 384 (3d Cir. 2018), listed membership in a protected class as an element of a plaintiff's prima facie case. *Id.* at 402. But in *Ames v. Ohio Department of Youth Services*, 605 U.S. 303 (2025), the Supreme Court held that courts must hold "majority group" and "minority group" plaintiffs to the same standard when determining whether they carried their burden under the first step of the *McDonnell Douglas* framework. *Id.* at 313. In light of *Ames*, it makes little sense to inquire into whether the plaintiff is a member of a "protected class" because no one class is more protected than another. *Id.* at 313. ("Our case law thus makes clear that the standard for proving disparate treatment under Title VII does not vary based on whether or not the plaintiff is a member of a majority group.").

could be "sufficient to convince a reasonable factfinder to find all of the elements of [the] prima facie case." *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013). To be entitled to summary judgment in his favor, the plaintiff must demonstrate that, based on the evidence in the record, a reasonable jury would be *compelled* to find that the plaintiff has proven each element of the prima facie case. *See El*, 479 F.3d at 238.

Second, if a plaintiff meets his initial burden, the defendant must then advance a legitimate nondiscriminatory reason for the adverse employment action. *Burton*, 707 F.3d at 426. The defendant's burden at this stage is relatively light: the defendant need only articulate legitimate reasons for the adverse action; they need not prove that the articulated reason actually motivated the adverse action. *Id.* at 426.

And finally, if the defendant produces such a nondiscriminatory reason, the plaintiff may prevail by demonstrating that the employer's stated reason is merely a pretext for discrimination. *Burdine*, 450 U.S. at 253. A plaintiff may do so by undermining the employer's stated reasons, *i.e.*, by pointing to evidence that would allow a factfinder to disbelieve the employer's stated reason or that the proffered reason was not an actual reason for the employment action, and may do this by demonstrating "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons." *Willis v. UPMC Child.'s Hosp. of Pittsburgh*, 808 F.3d 638, 644-45 (3d Cir. 2015). Or the plaintiff may do so by bolstering the plausibility of the discriminatory explanation, *i.e.*, by pointing "to evidence that would allow a factfinder to believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* at 645 (internal quotations omitted).

C.      **Retaliation**

Title VII prohibits employers from "discriminat[ing] against any individual . . . because he has opposed any . . . unlawful employment practice." 42 U.S.C. §2000e-3(a). As such, Title VII prohibits retaliation. Section 1981 and PHRA do the same. *See Est. of Oliva ex rel. McHugh v. New Jersey*, 604 F.3d 788, 798 n.14 (3d Cir. 2010) (Section 1981); *Wilson v. Columbia Gas of Pa.*, 676 F. Supp. 3d 424, 436 (W.D. Pa. 2023) (PHRA).

Like discrimination claims, retaliation claims operate under the familiar burden-shifting framework. First, to state a prima facie case, the plaintiff must prove that:

(1) he engaged in a protected activity,
(2) he suffered an adverse . . . action, and
(3) there was a causal connection between the participation in the protected activity and the adverse action.

*Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 257 (3d Cir. 2017).

"[A] plaintiff may rely on a 'broad array of evidence' to demonstrate a causal link between his protected activity and the adverse action taken against him." *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 302 (3d Cir. 2007) (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 284 (3d Cir. 2000)), *as amended* (Aug. 28, 2007). The plaintiff can point to a pattern of antagonism, an "unusually suggestive" temporal proximity, or an employer's inconsistent explanations. *See Carvalho-Grevious*, 851 F.3d at 260. These are not exclusive ways of proving causation. *Id.* Whatever kind of evidence a plaintiff relies on, the operative question remains the same: is the plaintiff's evidence "sufficient to raise the inference that her protected activity was the *likely reason*" for the adverse action? *Id.* at 259.

If plaintiff successfully makes out a prima facie case, the burden then shifts to the defendant to provide a legitimate, non-retaliatory reason for its actions. *Id.* at 257. If the defendant does so, the burden shifts back to the plaintiff to prove both that the employer's explanation is false, and

that retaliation was the "real reason" (*i.e.*, the but-for cause) that the employer took the adverse employment action. *Id.* at 258.

### D. Hostile Work Environment

Title VII, Section 1981, and PHRA also prohibit harassment that is "sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013) (Title VII); *Castleberry*, 863 F.3d at 263 (Section 1981); *Larochelle v. Wilmac Corp.*, 769 F. App'x 57, 61 (3d Cir. 2019) (PHRA). To succeed on a hostile work environment claim, the plaintiff must demonstrate that:

(1) the employee suffered intentional discrimination because of his/her [race],
(2) the discrimination was severe or pervasive,
(3) the discrimination detrimentally affected the plaintiff,
(4) the discrimination would detrimentally affect a reasonable person in like circumstances, and
(5) the existence of *respondeat superior* liability [meaning the employer is responsible].

*Castleberry*, 863 F.3d at 263 (citing *Mandel*, 706 F.3d at 167) (alterations in original).

### III. Albert's Claims

Albert moved for partial summary judgment on the elements of his race discrimination claim of "membership in a protected class, qualifications for the position, adverse employment action, inference of discrimination, and . . . pretext," as well as a mixed-motive theory under PHRA and Title VII. (ECF No. 97 ¶ 3). Albert moves for summary judgment on the elements of his hostile work environment claim of "intentional discrimination because of race, severe or pervasive discrimination, discrimination that detrimentally affected the plaintiff, discrimination that would detrimentally affect a reasonable person in like circumstances, and respondeat superior liability."

(ECF No. 97 ¶ 5). Albert also moves for summary judgment on AHN's affirmative defense of mitigation of damages. (ECF No. 97 ¶ 6).

AHN, for its part, moves for summary judgment "with respect to all counts and claims set forth by Plaintiffs in the Second Amended Complaint." (ECF No. 113).

The Court denies Albert's Motion for Partial Summary Judgment, and grants in part and denies in part AHN's Motion for Summary Judgment as it relates to Albert's claims.

### A.   Race Discrimination

There is no dispute over whether Albert was qualified for the position he occupied. There is a dispute, however, over the adverse employment actions that Albert was subjected to, whether he was subjected to those adverse actions under circumstances that give rise to an inference of discrimination, and whether AHN's proffered nondiscriminatory reasons were pretextual.

Albert claims that he was subjected to at least four discrete adverse employment actions on account of his race: (1) he was denied a promised promotion; (2) he was denied a bonus; (3) he was "reassigned," by which he claims he was pulled out of training prematurely, was given a less favorable shift, and was forced to attend early morning meetings; and (4) his employment was terminated. Albert claims that he suffered the first three actions at the hands of Allen and the last one at the hands of Turner. The Court will address each of Albert's claims and related assertions in turn.

### 1.   Denial of Promised Promotion / Failure to Promote

Albert claims that he was subjected to an adverse employment action when Allen failed to promote him to manager-level position within ninety days of hiring him, and that she did not promote Albert on that timeline because of his race. AHN argues that Albert's non-promotion does not constitute an adverse employment action at all, and, in any case, the failure to promote Albert

23

within ninety days had nothing to do with his race. (ECF No. 115 at 19–20). The Court concludes that Albert has not created a genuine dispute of material fact as to whether he suffered an adverse employment action when he was not so promoted within the first ninety days of his employment with AHN. Based on the evidence in the record, no reasonable jury could find for Albert on this point.

A plaintiff suffers an adverse employment action when they are subjected to "some harm respecting an identifiable term or condition of employment." *Muldrow v. City of St. Louis*, 601 U.S. 346, 355 (2024). Failing to promote an employee is a quintessential adverse employment action. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) ("A tangible employment action constitutes a significant change in employment status, such as . . . failing to promote."). Delay of a promotion—at least without backpay—may also constitute an adverse employment action. *See Coefield v. GPU*, 125 F. App'x 445, 449 (3d Cir. 2005); *Harley v. Paulson*, No. CIV 07-3559, 2008 WL 5189931, at *3 (D.N.J. Dec. 9, 2008).

But, to prove that he was "denied" a promotion or that his promotion was "delayed," the plaintiff needs to prove that there were promotions to be had. *See Peifer v. Bd. of Prob. & Parole*, 106 F.4th 270, 277 (3d Cir. 2024) (quoting *Muldrow*, 601 U.S. at 354) ("[A]n adverse employment action means simply. . . that the employer treated the employee 'worse' because of a protected characteristic."); *Young v. Temple Univ. Hosp.*, 359 F. App'x 304, 310 (3d Cir. 2009) ("Young's subjective expectation that Temple would create an entirely new position for her (and her alone) cannot support a *prima facie* case of retaliation."). Ordinarily, this involves demonstrating that there was a vacancy that the employer was trying to fill. *See Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir.1994 ) (A plaintiff may make out a prima facie case for failure to promote by showing "(i) that he belongs to a [protected category]; (ii) that he applied and was qualified for a job *for which*

*the employer was seeking applicants*; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position *remained open*." (emphasis added)). This might also be done by demonstrating that others were promoted into the position that the plaintiff sought. *See Stoppi v. Wal-Mart Transp., LLC*, No. 3:09CV916, 2010 WL 3398990, at *9 (M.D. Pa. Aug. 26, 2010) ("Defendant did not promote anyone, and thus did not make an adverse employment decision.").

Here, Albert has offered no evidence that suggests that a manager-level position was available in the first ninety days of his time at AHN. Albert testified that he is not aware of any such vacancy during the first months of his employment. (Albert Dep. 65:4-6, ECF No. 100-3 at 18).[6] Albert also testified that he could not recall whether "any other call center supervisor . . . was promoted to a manager position" during that time period. (Albert Dep. 65:7-10, ECF No. 100-3 at 18). What's more, the evidence in the record suggests that Albert was promoted to a manager-level position when a vacancy did arise. (ECF No. 121 ¶¶ 19-20). In September 2017, Constantin was promoted from "Operations Manager" to a director-level position, and only a few months later, in January 2018, Albert was promoted into the manager-level role that Constantin vacated. (ECF No. 117 ¶¶ 24-25; ECF No. 121 ¶ 19). Albert desired a promotion, and he was promoted, just not as soon as he would have liked.

Some courts in the Third Circuit have concluded that an employer's promise to create a position and subsequent failure to follow through may constitute an adverse employment action. *See, e.g.*, *Frintner v. TruePosition*, 892 F. Supp. 2d 699, 710-11 (E.D. Pa. 2012); *Stoppi*, No. 3:09CV916, 2010 WL 3398990, at *9-10; *see also Young*, 359 F. App'x at 310. The Court need not determine whether it agrees with these courts' analyses because, based on the evidence in the

---

[6] More precisely, when asked, "Were you aware of any open manager position during that 60- to 90-day period?," Albert responded, "I'm not aware. I don't recall." (Albert Dep. 65:4-6, ECF No. 100-3 at 18).

record, a jury could not conclude that Albert was actually promised a promotion within ninety days of his initial hiring, no matter what. The only evidence Albert points to is his own deposition testimony. In his deposition, Albert testified that, during his interview for the supervisor-level position, Albert expressed concerns about making a "lateral or lower-level move." (Albert Dep. 64:13-20, ECF No. 100-3 at 18). Albert further testified that, in response to these concerns, "Ms. Allen basically stated it won't be for a long time. It's going to be *possibly* 60 to 90 days. We just want you to get acclimated, you know, to healthcare and our environment." (Albert Dep. 64:16-20, ECF No. 100-3 at 18 (emphasis added)).

Being told that you might be promoted before too long, "possibly 60 to 90 days," is not the same as being promised a promotion within 60 to 90 days no matter what. *Cf. Young*, 359 F. App'x at 306, 310 (finding no promise to promote where manager told employee she would "look into" creating position for employee); *Frintner*, 892 F. Supp. 2d at 710 (finding no promise to promote where manager "promised to try to get" employee a promotion). And, as AHN points out, Albert was promoted before long. Only a year into his tenure at AHN, Albert applied and was selected for a manager-level position, and there is no record evidence that one was available any sooner. Given that Albert has advanced no record evidence that a promotion was available for him before then, or that there was a promise that AHN would create a position to promote him into, and given that he was in fact promoted within a year, the record does not support his failure to promote claim. Accordingly, the Court will grant AHN's Motion for Summary Judgment and deny Albert's Motion, each with respect to this claim.

### 2.    Denial of Bonus

Albert also claims that he was "consistently denied" bonuses by Allen. (ECF No. 99 at 10). According to Albert, at the end of 2018, Allen gave bonuses to two white employees, John Guthrie and Janet Constantin, but did not give Albert a bonus. (ECF No. 117 ¶ 40).

Denial of a bonus, even a discretionary one, may also constitute an adverse employment action. *See Sala v. Hawk*, 481 F. App'x 729, 732 (3d Cir. 2012). But as with the promotion, to demonstrate that he was unlawfully denied a bonus—as opposed to merely just did not receive one that he wanted—Albert must present some evidence that there were bonuses to be had for those similarly situated to him. *See Gabriel v. Del. River Port Auth.*, No. CV 01-5815, 2004 WL 7345585, at *9 (D.N.J. June 1, 2004) ("[W]hile plaintiff argues that she suffered an adverse action when she did not receive a pay raise in 2002, she admits that no one in the Toll Audit department, where she works, received such a raise."); *Potash v. Fla. Union Free Sch. Dist.*, 972 F. Supp. 2d 557, 582-83 (S.D.N.Y. 2013) ("Failure to provide an employee with a raise may constitute an adverse employment action where Plaintiff can show that she was denied a salary increase received by similarly situated individuals as a result of discrimination."). "Some evidence" might take the form of a term in an employment contract providing that the plaintiff's position was eligible for a bonus, a representation that the plaintiff was eligible for a bonus, evidence that similarly situated persons received bonuses, or recorded past practices.

As far as the Court can tell, Albert has advanced evidence of none of the above. The only evidence regarding bonuses that Albert proffers in his briefing and statements of facts is his own testimony that John Guthrie and Janet Constantin—two director-level employees in positions above his—received bonuses. (ECF No. 117 ¶ 40). Albert's briefing identifies no evidence that he or anyone else holding a manger-level position (the position he held) were entitled to—or even

eligible for—bonuses, and Albert testified that he did not know of any manager receiving a bonus in 2018. (*See* Albert Dep. 123:9-14, ECF No. 100-3 at 33). Accordingly, the Court will grant AHN's Motion for Summary Judgment with respect to this claim and will deny Albert's Motion for Summary Judgment, each on the same basis.

### 3.    "Reassignment"

Under the heading of "reassignment," Albert alleges a few possible adverse employment actions. First, he claims that he was not provided with promised training. Second, he claims that he was forced to work the 11:00 AM to 8:00 PM shift. In his reply, Albert also alleges that he was forced to attend 6:00 AM meetings. (*See* ECF No. 99 at 8; ECF No. 119 at 8-9). The Court will address each in turn.

### i.    Denial of Training

Albert claims that he was promised "complete training and onboarding," but was pulled out of training prematurely. (ECF No. 119 at 9). In his deposition, Albert testified that he did "complete[] the new hire onboarding process," (Albert Dep. 67:7-10, ECF No. 100-3 at 19), but that he did not receive training on "how to schedule appointments and work through the scheduling system." (Albert Dep. 67:11-16, ECF No. 100-3 at 19).

Denial of training itself ordinarily does not constitute an adverse employment action. *See Cross v. Postmaster Gen. of U.S.*, 696 F. App'x 92, 95 (3d Cir. 2017). That said, denial of training may constitute an adverse employment action if it impedes career advancement, *see Albright v. City of Phila.*, 399 F. Supp. 2d 575, 588 (E.D. Pa. 2005), results in reprimand, docked pay, suspension, or termination, *Paradisis v. Englewood Hosp. Med. Ctr.*, 680 F. App'x 131, 136 (3d Cir. 2017), or otherwise results in "some harm respecting an identifiable term or condition of employment," *Muldrow*, 601 U.S. at 355; *see also Ford v. Cnty. of Hudson*, 729 F. App'x 188,

195 (3d Cir. 2018) ("The denial of an opportunity to become marginally more efficient in the execution of her duties does not constitute an adverse employment action, particularly where no evidence in the record suggests that any conditions or privileges of her employment were affected as a result.").

Here, Albert has offered no evidence that he suffered any harm in an identifiable term or condition of employment because he was denied additional formal training. In fact, he testified that despite what he describes as the lack of formal training, he was able to get help from his colleagues and teach himself how to do the relevant tasks within a couple months. (Albert Dep. 68:9-20, ECF No. 100-3 at 19). Albert testified that by the time he started reporting to John Guthrie, he was "pretty solid" at performing these tasks. (Albert Dep. 69:6-8, ECF No. 100-3 at 19). Therefore, Albert has not produced sufficient evidence such that a reasonable factfinder could conclude that AHN's alleged failure to train Albert had any negative impact on him or the work, which would be necessary to constitute an adverse employment action. Critically, his own testimony actually cuts against him on this claim.

Further, even to the extent that a denial of training is itself a "harm respecting an identifiable term or condition of employment," *Muldrow*, 601 U.S. at 355, Albert has not marshalled evidence from which a jury could reasonably infer that he was denied training on account of his race. He has not advanced record evidence that this scheduling training—or any other training—was provided to employees of different races than his.[7] He has not offered evidence that Allen learned of his race between the time that she hired him and the time that pulled

---

[7] When asked whether this training was offered to other employees or whether this was just training that the felt AHN should have provided him, Albert responded: "This is training that I felt that they should have provided me based on the conversation that Diane Allen and I had during the interview." (Albert Dep. 67:20-22, ECF No. 100-3 at 19).

him out of training. Albert has failed to offer any evidence tying Allen's purported bigotry to her decision to pull him out of this training, and so his denial-of-training claim fails on this basis as well. *See Thomas v. Keough*, No. 220CV05758, 2024 WL 414041 (D.N.J. Feb. 5, 2024) ("Even if racist remarks were made, Plaintiff has not demonstrated that discrimination was the reason he was 'demoted.'"); *Garcia v. Regan*, No. 19-CV-8482, 2022 WL 912234, at *14 (S.D.N.Y. Mar. 28, 2022) ("[I]t is not enough to label the supervisor a bigot or a discriminator.").

Accordingly, the Court will grant AHN's Motion for Summary Judgment with respect to AHN's denial of training claim and will deny Albert's Motion for Summary Judgment with respect to the same.

### ii.    Late Shift

Albert also claims that he was discriminated against when he was required to work the 11:00 AM to 8:00 PM shift, instead of the 8:00 AM to 4:30 PM shift that he says he was promised.

As an initial matter, the Court concludes that Albert's assignment to the late shift may—but need not—constitute an adverse employment action. In *Muldrow*, the Supreme Court held that a lateral transfer may form the basis of a discrimination claim under Title VII, so long as the transfer "brought about some 'disadvantageous' change in an employment term or condition." 610 U.S. at 354. Here, it's apparent that the assignment to the late shift affects an "identifiable term or condition of employment": namely, it affects the hours during which Albert is expected to work. A jury could rationally conclude that this change—working from 11:00 AM to 8:00 PM instead of 8:00 AM to 4:30 PM—constitutes "some harm" in the form of assignment to a worse shift. *See McClintock v. Garland*, No. 3:20CV1548, 2024 WL 4217521, at *10 (M.D. Pa. Sept. 17, 2024) (denying summary judgment for defendant where the plaintiff presented evidence that he suffered an adverse employment action when "he was stripped of his administrative duties and had his usual

working hours changed"). At the same time, a jury need not necessarily conclude that this schedule

change constitutes "some harm." *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69

(2006) ("A schedule change in an employee's work schedule may make little difference to many

workers, but may matter enormously to [others].").

The question then becomes whether Albert's assignment to the late shift occurred "under

circumstances that support an inference of unlawful discrimination." *In re Tribune Media Co.*, 902

F.3d at 402. Among other things, Albert offers the following evidence of discriminatory intent:

- Evidence that a similarly situated white employee—Kimberley Stoyanoff—worked the shift that Albert desired. (Albert Dep. 245:25-248:5, ECF No. 100-3 at 63-64).[8]
- Evidence that Allen made statements that were overtly and undeniably racist.
  - Allen referred to an employee of AHN's parent company as "a nasty, lying black woman," or something along those lines. (ECF No. 117 ¶ 59).
  - Albert testified that Allen referred to a person of middle eastern descent as a "sand n*****." (Albert Dep. 149:17-22, ECF No. 100-3 at 39).[9]
  - Guthrie testified that Allen said, in reference to a person named Waleed, "Habeeb, Hamad, Ahmad, or whatever his terrorist name is." (Guthrie Dep. 147:4-148:18, ECF No. 100-2 at 39).
  - Albert testified that Allen told him that he and another Black employee were "good blacks, not n*****s." (ECF No. 117 ¶ 57).
  - Guthrie testified that Allen referred to Le'Veon Bell as a "n*****" after he didn't report to Steelers' training camp. (ECF No. 117 ¶ 36).
- Evidence that Allen made comments that could be reasonably interpreted as racist or at the least race-related in a derogatory way.
  - One AHN employee submitted a declaration in which she averred that Allen said, "there you go, there's another welfare baby" upon learning that the employee's granddaughter would be "half black and half white." (Sowards Decl. ¶ 10, ECF No. 102-1 at 3).[10]

---

[8] AHN does not appear to dispute that Stoyanoff worked this shift.

[9] AHN does not dispute that Albert so testifies, but rather contends that no reasonable jury would credit Albert's testimony given its lack of independent evidentiary support. Such independent corroborating evidence is not required by prevailing law. Further, it is not the Court's role at summary judgment to make credibility determinations or to weigh the evidence. *See Boyle*, 139 F.3d at 393. Accordingly, AHN's arguments as to whether these statements were made and what their content was are more properly directed to the jury at a trial.

[10] AHN complains that the content of Sowards's declaration is inadmissible at trial. While this is true as far as it goes, the Court may still consider it because its content could be reduced to

- o Another AHN employee testified that, while hiring on behalf of AHN, Allen would say things like "With a name like that . . . don't bring them in; you can't bring them in." (Paranzino Dep. 25:11-14, ECF No. 102-2 at 8).
- o Albert testified that he heard Allen refer to a coworker's Black husband as "garbage." (ECF No. 117 ¶ 22).
- o Albert and Guthrie testified that Allen often used the phrase, "Not my circus, not my monkeys." (Albert Dep. 86-87, ECF No. 100-3 at 24; Guthrie Dep. 149-51, ECF No. 100-2 at 39-40).
- o Albert and Guthrie testified that Allen said to Guthrie, "You better get your boy in line," with "your boy" referring to Albert. (ECF No 117 ¶ 18).[11]
- o Albert testified that Allen told him that shopping at K-Mart and Walmart were "ghetto." (Albert Dep. 107:9-17, ECF No. 100-3 at 29).
- Evidence that Allen made derogatory comments about others based on protected characteristics. (ECF No. 117 ¶ 67).

Taken together, this evidence is sufficient to create a genuine dispute of material fact regarding whether Albert's assignment to the late shift occurred under circumstances that give rise to an inference of discrimination. *See Mandel*, 706 F.3d at 170 (more favorable treatment of a similarly situated individual may give rise to an inference of discrimination); *Antol v. Perry*, 82 F.3d 1291, 1301-02 (3d Cir. 1996) (derogatory remarks by decisionmaker may suggest discriminatory intent); *Branch v. Temple Univ.*, 554 F. Supp. 3d 642, 654 (E.D. Pa. 2021) (decisionmaker's use of a racial slur can be evidence of pretext); *Fuentes*, 32 F.3d at 765 (prior discrimination by decisionmaker may be evidence of pretext). But at the same time, the evidence is not so overwhelming or conclusive that a jury would have to find for Albert on this specific

---

admissible form for trial, namely by her coming into court and testifying as a witness. *See* Fed. R. Civ. P. 56(c)(2). AHN also complains that the declaration lacks independent evidentiary support and notes that Allen fired Sowards, suggesting that Sowards should not be believed. (See ECF No. 117 ¶ 46). Again, these arguments are more properly directed to the jury at trial. *See Boyle*, 139 F.3d at 393.

[11] AHN argues that the term "boy" can be used to refer to a friend. (ECF No. 117 ¶ 18). True enough. But it is also true that referring to a Black adult man as a "boy" can be an invocation of a longstanding, harmful, and derogatory racial stereotype. *See, e.g.*, *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006) ("Although it is true the disputed word ['boy'] will not always be evidence of racial animus, it does not follow that the term, standing alone, is always benign.").

issue, namely whether Albert's late shift assignment was in part or in full motivated by discriminatory animus. AHN again argues that much of Albert's evidence comes from his own deposition testimony, and some of it lacks independent evidentiary support. But there is no legal principle that either requires independent evidentiary support or that disqualifies or discounts a plaintiff's own testimony simply because it is the plaintiff's own. And while such testimony, if believed, would certainly support a finding in Albert's favor, it is not so conclusive that a jury would be required to find in his favor as to what was said, by who, to whom, and to what effect. Therefore, Albert is not entitled to summary judgment in his favor.

AHN, for its part, offers a non-discriminatory reason for assigning Albert the later shift. According to AHN, Albert was assigned the later shift because, at the time that he joined AHN in January 2017, that was the only shift available. (ECF No. 117 ¶ 15). Kimberley Stoyanoff, the white supervisor who Albert claims received his desired shift, was hired before Albert and was already working the 8:00 AM to 4:30 PM when he arrived at the workplace. (ECF No. 115 at 21; ECF No. 117 ¶ 15). In other words, AHN claims that scheduling concerns and seniority guided its decision to assign Albert to the late shift, and the earlier shift that he says he wanted and was entitled to was already filled.

Because AHN has advanced a nondiscriminatory reason for assigning Albert the late shift, the question becomes whether AHN's stated reason could rationally be found to be pretextual. Albert may demonstrate pretext either by presenting evidence that could lead a factfinder to "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764.

All of Albert's evidence falls into the second bucket. His evidence of pretext is the same as his evidence of discriminatory intent. (*See* ECF No. 119 at 9). While there is nothing impermissible about this formulation, *see Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 370 (3d Cir. 2008), the Court concludes that Albert's advanced record evidence is insufficient for this portion of his case to proceed further. For Albert to prevail at the pretext stage, it is not enough for him to demonstrate that racist comments were made or even that Allen is a blatant racial bigot (which a jury could conclude if the testimony set out above is credited). Rather, he must provide evidence from which a jury could reasonably conclude that discrimination caused (i.e., was a motivating or determinative factor in) his assignment to the late shift. *Fuentes*, 32 F.3d at 762; *see Thomas*, 2024 WL 414041, *13 ("Even if racist remarks were made, Plaintiff has not demonstrated that discrimination was the reason he was 'demoted,' therefore Plaintiff has failed to satisfy his burden of establishing pretext."); *Garcia*, 2022 WL 912234, at *14 ("[I]t is not enough to label the supervisor a bigot or a discriminator."). Albert has not done so.

AHN's stated rationale facially explains its decision to assign Albert the late shift with reference to the kind of objective, race-neutral criteria ordinarily relied on by businesses making scheduling decisions. Albert has advanced no evidence that undermines AHN's stated reason by exposing its "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions." *Fuentes*, 32 F.3d at 765. He doesn't offer evidence that Stoyanoff was not already working Albert's desired shift, nor that AHN allowed new hires to take the shifts of established employees by displacing those employees from shifts they were already working, nor that shifts were routinely shuffled such that Albert would have had an actual opportunity for the shift that he preferred exactly when he desired it. In short, he has not advanced record evidence that other employees similarly situated were treated more favorably than him on this issue. Having failed to undermine

AHN's stated rationale in the slightest, Albert's evidence that Allen allegedly made racist comments is insufficient to permit a reasonable jury to conclude that racial animus infected AHN's decision to assign Albert to the late shift.

Even in this area of the law, two things may be true at the same time. Crediting Albert's evidence about her workplace statements, a jury may well conclude that Allen is a bigot, but at the same time, Albert has not advanced evidence that calls into question the stated reason that Albert was not placed into the shift Stoyanoff was already working, nor has he advanced other evidence from which a rational jury could conclude that any bigotry on Allen's part was the cause of Albert's shift assignment.

### iii.    Early Meetings

Albert claims that he was discriminated against by Allen again when he was required to attend 6:00 AM office meetings. A person's workload and assignments are plainly a "term or condition" of employment and receiving a heavier workload or less favorable assignments could be found to constitute "some harm." *Muldrow*, 601 U.S. at 355. Therefore, the assignment of additional, burdensome responsibilities, particularly without additional pay, may be found to be an adverse employment action. *Jakomas v. City of Pittsburgh*, 342 F. Supp. 3d 632, 645 (W.D. Pa. 2018) ("[A] change in employment status, *responsibilities*, or duties—even without a reduction in pay—may qualify as an adverse employment action." (emphasis added)); *Riley v. Del. River & Bay Auth.*, 661 F. Supp. 2d 456, 466 (D. Del. 2009); *Prioli v. Cnty. of Ocean*, No. 2:18-CV-00256, 2021 WL 4473159, at *4-5 (D.N.J. Sept. 30, 2021).

For all of the adverse employment actions he allegedly suffered at the hands of Allen, Albert offers the same evidence to support his prima facie case. But here, Albert's evidence— particularly the evidence of Allen's use of discriminatory and harassing language—is sufficient to

create a genuine issue of material fact as to whether Albert was assigned to attend the early morning meetings in part or in whole due to unlawful discrimination. This is because, while the prima facie case is the same as the facts above concerning assignment to the late shift, Albert here marshals sufficient evidence of pretext.

AHN offers two non-discriminatory reasons for requiring his attendance at early morning meetings: (1) that Albert "was the most knowledgeable from a strategic standpoint when it comes to building the questionnaires"; and (2) that at the time Albert was the only Operations Manager in the call center. (ECF No. 117 ¶ 41). But Albert offers evidence from which it could be rationally concluded that either or both of these two reasons are pretextual. First, Albert disputes that he was in fact the most knowledgeable. In his deposition, Albert testified:

> No, I wasn't the most knowledgeable about the topic. I didn't have clinical expertise. When it comes to strategic layouts and implementations and rollouts, I'm pretty good at that, but when it comes to orthopedics, there is other supervisors that are experts at orthopedics, and, again, when it comes to the clinical data or clinical knowledge, I don't have that.

(Albert Dep. 248:17-24, ECF No. 100-3 at 64). For starters, in the Court's experience, it is rare for an employee to diminish their own capabilities in either an absolute or relative sense as Albert does in this testimony. But be that as it may, given that Albert disputes that he was the "most knowledgeable," the subjective nature of this kind of assessment, and Albert's other evidence of Allen's discriminatory comments and actions, a reasonable jury could—but need not—find that discriminatory animus, rather than Albert's job knowledge, motivated Allen's decision to require him to attend the early morning meetings, as opposed to assigning the early morning meetings to another employee.

Similarly, a reasonable jury could also find that Albert's position as Operations Manager did not actually motivate Allen's decision to assign him early morning meetings. AHN does not

explain why an Operation's Manager—as opposed to someone at a different level of seniority—needed to attend these early-morning meetings. In fact, according to Albert's deposition testimony, two other employees at different levels of seniority—Constantin and Allen—were also invited to these early-morning meetings but seemingly did not attend. (Albert Dep. 249:8-9, ECF No. 100-3 at 64). Based on this and Albert's evidence of Allen's discriminatory behavior, a reasonable jury could conclude that Albert's position as Operation's Manager did not actually motivate Allen's decision to require him to attend these meetings and was merely a pretext for discrimination.

Both parties' Motions for Summary Judgment on this adverse employment action are denied. This claim may advance further.

### 4.    Termination of Employment[12]

Lastly, Albert argues that the termination of his employment by Turner was unlawful discrimination.

### i.    Prima Facie Case

As a reminder, to make out a prima facie case of race discrimination based on termination of employment, a plaintiff must generally show that he was qualified for the position he occupied, that he was terminated, and that the circumstances give rise to an inference of unlawful discrimination. *See In re Tribune Media Co.*, 902 F.3d at 402. AHN contests only whether the record contains evidence that would support an inference of discrimination and whether the record can support an inference of pretext.

---

[12] For the first time in his Reply, Albert claims that his placement on the PIP was a discrete adverse employment action. (ECF No. 119 at 9). Placement on a PIP, in and of itself, does not constitute an adverse employment action. *See Reynolds v. Dep't of Army*, 439 F. App'x 150, 153-54 (3d Cir. 2011) ("[B]ecause Reynolds failed to demonstrate that his PIP was accompanied by an adverse change in the conditions of his employment, we hold that Reynolds' placement on the PIP did not qualify as an adverse employment action.").

Albert proffers the following evidence that he says supports an inference of unlawful discrimination in the termination of his employment. (ECF No. 99 at 12-13).

- Assorted discriminatory and harassing conduct by Allen;[13]
- Two anonymous complaints made to AHN in February 2020 that accused Turner of "making disciplinary decisions based on sex and race," using racial slurs and making other racist comments, (Pls.' Ex. 42, AHN000987, ECF No. 105-8; Pls.' Ex. 43, AHN001226, ECF No. 106-1);
- The fact that Turner fired only two other employees for performance reasons, and one of these employees was Black, (ECF No. 117 ¶ 179);
- Albert's testimony that Turner referred to him as a diversity hire, (ECF No. 117 ¶ 167); and
- Statistical evidence of racial disparity in AHN's terminations, (ECF No. 124 ¶ 25).[14]

Concerning the second bullet point above, AHN objects to the consideration of the anonymous complaints against Turner. According to AHN, these statements are inadmissible hearsay that cannot be made into admissible evidence for trial and, therefore, may not be

---

[13] The Court notes that while Allen's comments and actions may be relevant, they would be insufficient to support an inference of discrimination if viewed standing alone. *See Patel v. CF Fresh LLC*, No. CV 22-1010, 2022 WL 16747276, at *12 (E.D. Pa. Nov. 7, 2022), *aff'd*, No. 22-3286, 2024 WL 957973 (3d Cir. Mar. 6, 2024) ("Racist comments by non-decisionmakers 'may provide some relevant evidence of discrimination' . . . but our Court of Appeals 'made clear . . . comments by those individuals outside the decision making chain . . . *standing alone*, are inadequate to support an inference of discrimination.'" (quoting *Burrows v. Twp. of Logan*, 415 F. App'x 379, 383-84 (3d Cir. 2011))). Albert's employment was terminated after Allen had been dismissed, but as noted above in extensive detail, by the time that Turner arrived on the scene and the decision was made to dismiss Albert, there was a workplace context regarding Albert and his work, and the operations in the Call Center that are part of the larger picture properly considered in resolving these motions.

[14] AHN does not dispute the validity of the underlying data, but rather accuses Albert of "mischaracterizing the data within the document produced in discovery." (ECF No. 124 ¶ 25). AHN does not, however, explain how Albert mischaracterized the data. And in any event, such an argument, based on mischaracterization of evidence, is one to be considered and addressed by a jury at trial. Beyond that, it is not obvious to the Court that this data are of the kind and character that would be admissible at trial to generate an inference that unlawful racial discrimination was afoot as Albert's employment was brought to an end. Consequently, that evidence, although in the record, does not in the Court's judgment go toward generating a genuine issue of material fact. If at trial the Plaintiffs intend to rely on statistical proof, such proof must be advanced in a manner consistent with applicable precedent on the use of such evidence.

considered by the Court at summary judgment. (ECF No. 115 at 16). Albert, for his part, contends

that the statements *could* be made admissible for trial, namely because they are either admissions

by a party opponent, business records, or statements concerning present state of mind. (ECF No.

119 at 7–8). Neither party really breaks a sweat in advancing their arguments for or against

considering such statements, leaving it for the Court to discern what consideration if any the

anonymous complaints warrant. (ECF No. 115 at 16; ECF No. 119 at 7-8). For reasons detailed

below, the Court has determined that it may consider the anonymous statements, but it also harbors

some substantial doubt that standing alone, they would generate a genuine issue of material fact,

as might the other more verifiable forms of evidence adduced in this case. If they were all that was

before the Court, as a prudential matter, they almost certainly would not be a barrier to the grant

of summary judgment.

  "The matters to be considered by the district court in a summary judgment proceeding are

limited to those authorized by Fed. Civ. Pro. Rule 56." *U.S. ex rel. Barber v. Com. of Pa.*, 429 F.2d

518, 520 (3d Cir. 1970). Rule 56 states that parties may object that material relied upon by an

opposing party in a motion for summary judgment "cannot be presented in a form that would be

admissible in evidence." Fed. R. Civ. P. 56(c)(2). Here, AHN challenges the consideration of the

anonymous complaints on hearsay grounds alone. AHN does not challenge the Court's

consideration of the anonymous complaints on Rule 403 grounds.

  Oftentimes, hearsay statements by unidentified sources cannot be considered in resolving

motions for summary judgment, as without the identity of the declarant known (or capable of being

known), the content of those statements cannot be reduced to admissible evidence. *Philbin v. Trans

Union Corp.*, 101 F. 3d 957, 960 n.1 (3d Cir. 1996); *Pineda v. Philadelphia Media Holdings* LLC,

542 F. Supp. 2d 419, 426 (E.D. Pa. 2008). However, in some circumstances—particularly in

employment discrimination cases—anonymous statements can and are considered by the court at the summary judgment stage. For instance, in *Scalia v. Ghosn*, the District Court for the Western District of Oklahoma held that it could consider anonymous employee statements made to a Department of Labor (DOL) investigator in resolving a summary judgment motion. 451 F. Supp. 3d 1215, 1221 (W.D. Okla. 2020). In that case, the plaintiff relied on anonymous employee statements compiled in an affidavit by a DOL investigator who had interviewed those employees. The defendants argued that those portions of the affidavit were inadmissible because they were hearsay. Plaintiff countered that the statements were "offered against an opposing party and . . . made by the party's agent or employee on a matter within the scope of that relationship while it existed." *Id.* at 1221. The court held that it could consider the statements.

Similarly, the District of New Hampshire held that it could rely on anonymous employee statements included in a Department of Labor investigator's declaration. *U.S. Dep't of Lab., Sec'y of Lab. v. Unitil Serv. Corp.*, 573 F. Supp. 3d 566, 576 (D.N.H. 2021), *vacated and remanded sub nom. Walsh v. Unitil Serv. Corp.*, 57 F.4th 353 (1st Cir. 2023), *reh'g granted, opinion withdrawn,* No. 22-1070, 2023 WL 2440154 (1st Cir. Mar. 8, 2023), *and on reh'g,* 64 F.4th 1 (1st Cir. 2023), *and vacated and remanded sub nom. Walsh v. Unitil Serv. Corp.*, 64 F.4th 1 (1st Cir. 2023).

Perhaps most similar to the present case, in *Wills v. Walmart Associates, Inc.*, the District Court for the Southern District of Florida held that an anonymous call to Walmart's global ethics hotline was not inadmissible hearsay in consideration of Walmart's motion for summary judgment. The plaintiff argued that the anonymous call was unsubstantiated and inadmissible, but the court rejected that, saying that the call was not being relied upon for the truth of the matter asserted on the call (that the plaintiff was, in fact, a bully) but rather to explain why Walmart had *believed* that the plaintiff may have been a bully, and that the plaintiff had not pointed to any evidence on the

record indicating that the call was unsubstantiated. *Wills v. Walmart Assocs., Inc.*, 592 F. Supp. 3d 1203, 1219 n.5 (S.D. Fla. 2022).

In each of these cases, the source of the statements has been ultimately verifiable by name, despite the statements themselves being made anonymously in the first instance. Here, too, the source of the statements is verifiable, but to a different degree and not by name, and absent an applicable exception to the rule against hearsay, that could be a bar to their consideration. *Philbin v. Trans Union Corp.*, 101 F. 3d 957, 961 n.1 (3d Cir. 1996). But the Court concludes that the record contains evidence from which it could be found by a preponderance of evidence that the statements were made by an AHN employee (albeit one that could not be called to the witness stand because their name was unknown) authorized if not required to make them, and that they were on a matter within the scope of the employment relationship, which would put the statements into the category of admissible evidence as admissions by a party opponent. *See* Fed. R. Evid. 801(d)(2)(D); Fed. R. Civ. P. 56(c)(2).

First, in light of the content of the statements and the fact that they were made on AHN's employee hotline, (*see* ECF No. 115 at 16), the Court concludes that it could be found to be more likely than not that the statements were made by an AHN employee. Both complaints are written from the perspective of an employee. In one, the complainant wrote: "She has utilized inappropriate language and gestures with both myself and many of my colleagues." (ECF No. 117 ¶ 160). "My colleagues" suggests that the complainant is an employee. In the other, the complainant wrote: "During a recent discussion, Melissa Turner utilized the term 'n*gger' and 'lowlife' when discussing our manager." (ECF No. 117 ¶ 162). Again, "our" manager suggests that the complainant works at AHN. While the Court does not have detailed evidence before it about the nature of the hotline (*e.g.*, who has access to it, how it is used), the fact AHN described

the complaint portal as the "employee hotline," (ECF No. 115 at 16), further suggests that the complainant was an employee. From those same inferences, the fact finder could also find that those statements were made on the basis that the declarant had personal knowledge of the matters complained of. Advisory Comm. Notes, Fed. R. Evid. 602 (personal knowledge may be found from the content of the statement itself). And in any event, the personal knowledge provision of Rule 602 is of limited force in the case of a party admission. *Blackburn v. United Parcel Serv., Inc.*, 179 F.3d 81, 96 (3d Cir. 1999) ("Admissions by a party-opponent need not be based on personal knowledge to be admitted under Rule 801(d)(2).").

Second, the Court concludes that the evidence in the record supports a finding that the statements are on a matter within the scope of their employment. Reporting harassment is part of AHN employee's duties. AHN's anti-harassment policy specifically provides: "Employees who observe or who learn of conduct that may constitute harassment should report it immediately." (Def.'s Ex. A, AHN000802, ECF No. 118-1 at 21); *see also Brown v. United States*, 933 F. Supp. 2d 780, 785 (E.D. Va. 2013) ("[R]eporting workplace sexual harassment is so clearly a part of an employee's duties."); *Booker v. Winn-Dixie Montgomery*, LLC, No. CIV.A. 11-00407, 2012 WL 5409794, at *8 (S.D. Ala. Nov. 6, 2012) ("Clearly, reporting harassment of an associate to company management, as a job-related duty, is a 'matter within the scope of' any . . . employee's employment relationship."). Therefore, the Court may and will consider the anonymous complaints leveled against Turner in deciding the cross motions for summary judgment because the Court concludes that they *could* be admissible at trial.[15] *Fraternal Order of Police, Lodge 1 v.*

---

[15] The ultimate admission of such statements may turn on the application of other rules of evidence not addressed here, such as Fed. R. Evid. 403. As stated above, AHN did not raise a challenge to the admissibility of the anonymous complaints under Rule 403 in its briefing. If properly raised in a motion *in limine* or during trial, the Court will, at that point, determine whether these complaints are properly admissible. It is possible that, at trial or the lead up to it, the Court would conclude

*City of Camden*, 842 F. 3d 231, 238-39 (3d Cir. 2016) ("[T]he rule in this circuit is that hearsay statements can be considered on a motion for summary judgment if they are *capable* of being admissible at trial. . . . We do not, of course, intend this ruling to control whether these out-of-court statements will *actually* be admitted at trial. That question need not be answered now." (citation omitted) (emphasis added)).

Under Rule 801(d)(2)(D), a statement by a party-opponent's employee "on a matter within the scope of that relationship and while it existed" is not hearsay. When determining the existence or scope of relationship under Rule 801(d)(2)(D), the court must consider—but may not exclusively rely upon—the content of the statement itself. Ultimately, if the admissibility of these complaints is challenged before or during trial, the Court would have to make a preliminary determination as to whether these statements were made by an employee and whether they made on a matter within the scope of the employment relationship. *See* Fed. R. Evid. 104(a); *Bourjaily v. United States*, 483 U.S. 171, 175-176 (1987). The Plaintiffs, as the proponents of these statements, will have to demonstrate these preliminary facts by a preponderance of the evidence. *See Bourjaily*, 483 U.S. at 175-76.

---

that the prejudicial effect of the anonymous complaints substantially outweighs their probative value. The Court's decision will, at that point, be based on the context of the record and argument before it. But those decisions focus on weighing the evidence and engaging in the balancing of the interests. That type of weighing and balancing of ultimate admissibility is not suited to this stage of litigation, particularly when Rule 403 has not been raised by the opposing party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ("[I]t is clear enough . . . that at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."). That all said, it strikes the Court that it may well be improvident for the Court to allow a jury to consider those complaints at trial, and that it would be unwise for the parties to predict or count on the Court's ultimate evidentiary ruling in such regards.

In addition to contesting the anonymous complaints' admissibility, AHN points to other evidence in the record to undermine the anonymous complaints. Specifically, AHN points to the lack of independent validation, the timing of the complaints,[16] the fact that AHN investigated these complaints and concluded they were unsubstantiated,[17] and Albert's testimony that he was surprised to hear about these complaints.[18] (*See* ECF No. 115 at 16-17). To undermine Albert's testimony that Turner referred to him as a "diversity hire," AHN pointed to the imprecision of his testimony and Albert's failure to contemporaneously report this comment to HR. (*See* ECF No. 115 at 17-18 (citing Albert Dep. 164-66, ECF No. 100-3 at 43-44)). Further, AHN notes that Turner hired a Black candidate to replace Guthrie in his director role, further undermining an inference of discrimination. (*See* ECF No. 115 at 18; ECF No. 121 ¶¶ 102-03).

The bottom line as to this claim is that there is more evidence in the record than the anonymous complaints that could lead a reasonable jury to conclude that Albert's termination arose out of unlawful discrimination. Namely, as mentioned before, there is evidence of assorted discriminatory conduct by Allen that contributed to the context of the employment situation that existed at the time Albert's employment was terminated, and that Albert testified that Turner referred to him as a "diversity hire" close in time to his discharge. In the Court's view, a reasonable jury could find in favor of Albert, even *without* considering the anonymous complaints as evidence. But on the other hand, the Court believes that a reasonable jury could also find against

---

[16] Albert was placed on a PIP on February 13, 2020, (ECF No. 117 ¶ 154), and these anonymous complaints were submitted on February 15 and 17, (ECF No. 117 ¶¶ 160, 162).

[17] After speaking with Albert and other witnesses, Pfalzgraf concluded that the claim was unsubstantiated. (ECF No. 117 ¶ 164).

[18] "Q: And you said you were surprised to hear about this anonymous complaint against Ms. Turner. A: Yes." (Albert Dep. 163:24-164:1, ECF No. 100-3 at 43).

Albert even *with* the anonymous complaints admitted to the record. Suffice to say, given the conflicting evidence, the Court concludes that there is a genuine issue of material fact regarding whether Albert's termination took place under circumstances that give rise to an inference of discrimination.

Accordingly, on this issue, neither party is entitled to judgment as a matter of law.

### ii.    Legitimate Reason for Termination

Here, AHN has advanced a legitimate, that is, nondiscriminatory reason for Albert's termination: his performance. (ECF No. 115 at 8-9); *see Ross v. Gilhuly*, 755 F.3d 185, 193 (3d Cir. 2014) (poor job performance is a legitimate, non-discriminatory reason for termination). According to AHN, shortly after her starting at AHN, Turner received complaints regarding Albert's behavior and personally observed other performance deficiencies.[19] (*See* ECF No. 121 ¶¶ 63–65). Albert received an off-track rating in his 2019 performance review for the section "Trust Working Together." (ECF No. 121 ¶ 86). On February 13, 2020, Turner placed Albert on a 30-day performance improvement plan (PIP) that identified the following areas for improvement:

---

[19] Albert disputes that Turner received these complaints on the grounds that her testimony that she received these complaints was "self-serving" and "lacks any independent evidentiary support." (*See* ECF No. 121 ¶ 64). As discussed above, this kind of argument is more properly aimed at the jury. Moreover, Turner testified to the following at her deposition: that one employee ("Ramana") "didn't just complain about Mr. Albert. It was a collective Mr. Guthrie and Mr. Albert. And she told me she really, you know, seemed -- I seemed very nice and that to watch my back around them," (Turner Dep. 123:12-15, ECF No. 118-11 at 36); that another employee ("Ms. Eubanks") told her "that sometimes she felt she couldn't speak up to him for fear of, like, retaliation. She thought he played favorites with some of the other team leaders, you know, she didn't trust him; so she was concerned of how to kind of work best with him. She felt everything she said would go to either the person she was saying about, if it was a colleague, if she was having, you know, trouble with a colleague," (Turner Dep. 142:14-21, ECF No. 118-11 at 39); and that another employee ("Liz Graswick") also complained about Albert, (Turner Dep. 144:17, ECF No. 118-11 at 40). Further, it appears beyond dispute that Turner testified she had the following criticisms of Albert's work: unclear communication, lack of follow-up, hard to get a hold of, missing meetings, lack of mentorship. (Turner Dep. 97:17-102:23, ECF No. 118-11 at 30-35).

professionalism, timeliness in response, working collaboratively, transformational leadership education, and demonstrating core behaviors. (*See* ECF No. 121 ¶ 89; Def.'s Ex. A, EEOC000031-32, ECF No. 118-1 at 1–2). After Albert failed to improve after a period of two months, Turner terminated Albert's employment on April 10, 2020. (ECF No. 121 ¶ 96). The termination letter provided to Albert by AHN identified performance deficiencies as the reason for termination. (ECF No. 121 ¶ 98; Def.'s Ex. A, AHN000615, ECF No. 118-1 at 6).

### iii.    Pretext

Because AHN has advanced a legitimate, non-discriminatory reason for terminating Albert's employment, Albert must show from record evidence that he can demonstrate pretext. When evaluating pretext, the operative question is not whether AHN's decision was "wrong or mistaken." *Fuentes*, 32 F.3d at 765. Rather, it is whether AHN's offered reason could be found to be "unworthy of credence" and merely a cover for unlawful discrimination. *Id.* Albert offers several arguments.

<u>First,</u> Albert suggests that the PIP could not be the real reason for the termination of his employment because it was not completed at the time he was terminated. Albert notes that Turner testified at her deposition that the PIP was the reason for Albert's termination.[20] Albert then offers evidence that the PIP was not complete at the time that the termination occurred and Chmiel's testimony that she would not have approved termination based solely on the incomplete grids in the PIP. (*See* ECF No. 117 ¶¶ 170-71).

---

[20] AHN disputes this as stated. (ECF No. 117 ¶ 155). Turner testified that Albert was terminated because "he did not meet the expectations that were outlined for him in the performance improvement plan." (Turner Dep. 220:8-11, ECF No. 118-11 at 70). Turner also testified that she could not recall any reasons for termination beyond those stated in the PIP. (Turner Dep. 220:12-221:13, ECF No. 118-11 at 70-71). While the Court notes the difference between the parties' formulations (i.e., whether he was fired because of the PIP or for the reasons listed in the PIP), the Court concludes that Albert's formulation is a plausible representation of Turner's testimony.

<u>Second,</u> Albert offers evidence that could suggest that "poor performance" could not have been the true reason for his termination because his performance was not, in fact, "poor." Specifically, Albert points to positive reviews from his coworkers and supervisors. Guthrie testified that Albert is "professional, passionate and eager, strong work ethic . . . very business oriented and . . . a strong leader." (ECF No. 117 ¶ 10). Allen testified that he did a good job on a particular project and was "very strong in his ability to understand how things worked." (Allen Dep. 28:11-22, ECF No. 118-4 at 6). Another coworker testified, "Santos was one of the hardest working people while I was there that I ever witnessed. I mean, he was – he would get there early, he would leave late." (ECF No. 117 ¶ 20). And another coworker stated that Albert was an "excellent supervisor[]/manager[]." (ECF No. 117 ¶ 144). In his 2019 performance review, despite receiving an off-track rating for "Trust Working Together," Albert's overall evaluation was "on-track," and the evaluation included a positive review from Kenyokee Crowell. (Def.'s Ex. A, AHN001794, ECF No. 118-1 at 72).

<u>Third,</u> Albert offers evidence that could suggest that Turner had already decided to terminate his employment before the PIP had even been initiated. He points to the text exchange between Turner and Chmiel in early February in which Chmiel says, "I think a PIP is less risky for us anyway," after telling Turner that HR could not substantiate the anonymous complaint it received about Albert. (Def.'s Ex. A, AHN001812, ECF No. 118-1 at 82). He also points to Turner's text message in which she asked, "There's no way to just cut ties with this group right? Cause I feel like core values is non existent here." He points to Chmiel's response: "There is the risk of being sued for wrongful termination. We need documentation to show why or that we set clear expectations and they still did not meet them. Unfortunately we can't just term." (Deft's Ex. A, AHN 001819, ECF No. 118-1 at 89). The Court takes the word "term" in that message to mean

"terminate." And Albert points to the fact that Turner reached out to employees asking them about Albert after being told she needed documentation, raising the possibility that Turner was fishing for reasons to terminate Albert. (*See, e.g.*, ECF No. 117 ¶ 141).

Fourth, Albert points to evidence that could suggest that Turner deviated from standard disciplinary procedures in effecting the termination of his employment. Specifically, AHN's progressive disciplinary process provides that, generally, corrective action should begin with "a documented coach and counsel," then escalate to a "verbal written warning," then a "written warning" at which point AHN can also issue a PIP. (*See* ECF No. 117 ¶ 182). According to Albert, Turner skipped the initial steps and went right to the PIP.[21]

Viewed as a whole, the evidence advanced by Albert is sufficient to create a genuine dispute over whether the stated reason for terminating Albert was pretextual. A reasonable jury could conclude, based on this evidence, that poor performance was not the real reason for Albert's termination. They could conclude that Turner could not have terminated Albert because of the PIP because it wasn't completed when she her terminated Albert's employment. A jury could also conclude from her messages with Chmiel that Turner had *already* decided to fire Albert before she put him on the PIP and that the PIP was a way to "paper over" discriminatory conduct.

But at the same time, Albert's proffered evidence is not so overwhelming and uncontroverted that no reasonable jury could find for AHN on the issue of pretext. Much of Albert's evidence is susceptible to multiple interpretations. The text conversation between Turner

---

[21] AHN does not appear to dispute that Turner skipped the initial steps and went right to the PIP. Rather, AHN notes that the policy also provides "steps of the progressive action process may be omitted" "depending on the severity of the unsatisfactory conduct or performance." (*See* ECF No. 117 ¶ 182). While true, Jamie Lusty (an employee in AHN's HR Department) testified that AHN's policy was to "initiate PIPs at written level or above." (ECF No. 117 ¶ 183). From Lusty's testimony, a jury could conclude that Turner's decision to put Albert on a PIP was an aberration from AHN's standard operating procedure.

and Chmiel and Turner's subsequent solicitation of information regarding Albert could be read as scheming a plan to improperly terminate Albert. But it could also be read as the work of a prudent HR department to document the preexisting issues with Albert's performance. Further, the complementary reviews of Albert's performance are not necessarily inconsistent with the problems identified by Turner. It could be true that some of Albert's colleagues thought he was good at his job., but it could also be true that Turner, who was responsible for assessing Albert's performance, thought Albert was not good at his job. AHN would be entitled to terminate Albert based on Turner's assessment, irrespective of his coworkers' opinions. While the Court is required to adopt the reading most favorable to Albert when ruling on AHN's Motion for Summary Judgment, the Court must take the opposite view when ruling on Albert's Motion.

Moreover, the record contains evidence that supports the conclusion that Albert was fired because of legitimate concerns about his performance and professionalism. Among other things, the record contains evidence that:

- Chmiel, Crowell, and Albert all apparently believed that "message delivery and tone is something [Albert] needs to improve on," (Def.'s Ex. A, AHN001624, ECF No. 118-1 at 60);
- Albert received an off-track rating in his 2019 performance review for the section "Trust Working Together," (ECF No. 121 ¶ 86);
- AHN received an anonymous complaint regarding Albert's communication with his team, (Def.'s Ex. A, AHN001198, ECF No. 118-1 at 44);
- In an email chain regarding this report, Turner wrote, "This is not a first time issue we are seeing," (Def.'s Ex. A, AHN001487, ECF No. 18-1 at 53);
- On April 7, 2020, Turner emailed Chmiel documenting the ongoing deficiencies in Albert's performance, using specific examples. The same day, Chmiel forwarded Turner's email to Jamie Lusty. Chmiel's email stated "Since being placed on a PIP[,] Santos has continued to struggle with giving clear direction to the supervisors that report to him as well as take clear direction and follow through when given direction from his leadership, Melissa Turner. The attached documentation supports and outlines continued concerns surrounding Santos' performance and management of his team. At this time Melissa would like to move forward with the termination of Santos Albert." Jamie Lusty reviewed the "supporting documentation" and supported "moving to term[ination]," (Pls.' Ex. 52, AHN001745-47, ECF No. 107-2 at 7-9).

From this evidence, a jury could reasonably conclude—despite the allegedly contrary evidence offered by Albert—that Albert was terminated because of perceived deficiencies in his performance.

Given the conflicting evidence, neither party is entitled to summary judgment on Albert's discrimination claim arising out of his termination.

### B.   Retaliation

Albert also claims that Turner terminated his employment in retaliation for Albert's May 2019 complaints against Diane Allen. AHN moves for summary judgment with respect to this claim on the grounds that Albert has not offered evidence of causation. Specifically, AHN argues that Turner did not know about Albert's complaints against Allen and that Albert's termination in April 2020 is too attenuated from his May 2019 complaints to give rise to an inference of retaliation. Albert, for his part, argues that factual issues preclude summary judgment on this claim. While the Court agrees with Albert that a jury could conclude that Turner knew about Albert's complaints,[22] the Court agrees with AHN that Albert has failed to marshal evidence giving rise to an inference of retaliation. Accordingly, the Court will grant summary judgment for AHN.

Albert's latest complaints regarding Diane Allen were made in May 2019, but his employment was not terminated until April 2020, almost a year later. Perhaps realizing that temporal proximity alone would be insufficient to support an inference of retaliation, Albert tries

---

[22] Though Turner testified that she did not know about Albert's protected activity, (ECF No. 121 ¶ 100; Turner Dep. 54:15-20, ECF No. 101-5 at 16), Albert introduced evidence that Turner knew about Allen's conduct, (ECF No. 117 ¶¶ 86, 90; Turner Dep. 57:15-19, ECF No. 101-5 at 16; Goldberg Dep. 150:20-151:9, ECF No. 100-4 at 40); that Turner knew Allen was fired because of her conduct (Turner Dep. 52-53, ECF No. 101-5 at 15); that Turner was told to "watch her back" around Guthrie and Albert, (ECF No. 117 ¶ 87); and that Turner said that Albert could be "ruthless," (Turner Dep. 177:1-14, ECF No. 101-5 at 46). From this record, reasonable jurors could conclude that Turner knew that Albert was involved in getting Allen fired for her discriminatory comments and had therefore engaged in protected activity.

to bridge this gap by arguing that he was subjected to a pattern of antagonism in the interim. (ECF No. 119 at 15). Albert says that after his protected activity there was a "sudden wave of unsubstantiated complaints from employees loyal to Allen after her departure"; Turner moved to put him on a PIP after supervising Albert for only 45 days; and Turner tried to fire Albert without proper documentation. (ECF No. 119 at 15).

All told, Albert's evidence even when viewed in a light most favorable to him nonetheless falls short. While the evidence does bear out that AHN received complaints about Albert and that AHN was not able to substantiate these complaints, Albert has not pointed to anything in the record connecting the complaints against him with his complaints against Allen. Though Albert alleges that these complaints came from employees who were "loyal" to Diane Allen, he provides no evidence to back this up. True, some of these complaints came through Constantin, but there's no indication that the people who were complaining to her were friendly—let along "loyal"—to Allen. Moreover, while the complaints do appear to have started after Allen's employment was terminated, they did not start until two to three months after. (*See* Crowell Dep. 212:21-25, ECF No. 101-2 at 55). As far as the Court can tell, the earliest complaint that is recorded in the documentary evidence was Kimberley Stoyanoff's September 25, 2019 complaint. (Def.'s Ex. A, AHN001151, ECF No. 118-1 at 36). Given the months-long gap, there is insufficient evidence to support the inference that Albert was targeted with these complaints because of his own complaints against Allen. *Cf. Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir. 2004) (concluding that a two-month gap is not unusually suggestive), *superseded by statute on other grounds as stated in Robinson v. First State Cmty. Action Agency*, 920 F.3d 182, 187-89 & n.30 (3d Cir. 2019). In this context, correlation does not create an inference of causation, absent a more significant connection of events.

The other pieces of Albert's purported pattern of antagonism fair no better. Turner's decision to put Albert on a PIP and her inquiry about terminating Albert without a PIP also occurred many months after Albert's May 2019 complaints, and as far as the Court can tell, Albert offers no evidence to connect these actions to Albert's complaints about Allen. Put differently, even if Albert was subjected to intervening antagonism, he has not marshalled evidence from which a jury could reasonably conclude that he was subjected to this antagonism because of his protected activity. Given this deficiency, Albert's evidence is not "sufficient to raise the inference that [his] protected activity was the *likely* reason" for the termination of his employment. *Carvalho-Grevious*, 851 F.3d at 259.

In his reply, Albert also suggests that there are other "indicia of retaliation." (ECF No. 119 at 15–16). Specifically, he notes that: (1) Xander Goldberg was not fired for his complaints against Albert because he helped Turner gather information about Albert; (2) Brianne Paranzino was rewarded with a promotion for submitting false complaints about Albert; and (3) AHN failed to follow its progressive discipline policies.

First, the Court agrees with AHN that the fact that Goldberg was not fired—even though he also complained about Allen—if anything suggests that Albert was not retaliated against, not the opposite. Second, the Court also agrees that Paranzino's promotion *years after* the events in question does not suggest retaliation. And third, even assuming that AHN failed to follow its progressive discipline policy and crediting the other evidence of pretext that was discussed at length above, Albert's evidence still does not support an inference that retaliation—as opposed to any other reason—was the likely reason for his termination.

Accordingly, the Court will grant AHN's motion to summary judgment with respect to Albert's retaliation claim.

### C.    Hostile Work Environment

Both AHN and Albert move for summary judgment on Albert's hostile work environment claim. The Court will deny both motions. To succeed on this claim at trial, Albert will have to demonstrate that:

(1) he suffered intentional discrimination because of his race,
(2) the discrimination was severe or pervasive,
(3) the discrimination detrimentally affected the plaintiff,
(4) the discrimination would detrimentally affect a reasonable person in like circumstances, and
(5) *respondeat superior* liability existed, meaning the employer is held liable.

*Castleberry*, 863 F.3d at 263. AHN argues that it is entitled to summary judgment because AHN is not liable for Allen's conduct in light of Albert's failure to report her to HR in a timely manner; because many of Allen's comments had nothing to do with race and were not sufficiently severe or pervasive; because Albert failed to show that he was detrimentally affected by Allen's conduct; because AHN took remedial action to address reports about Diane Allen; and because Turner's "hypervigilance" or "nitpicking" did not create a hostile work environment. (*See* ECF No. 115 at 28-38).

As an initial matter, the Court concludes that Albert has—at the very least—created a genuine dispute regarding AHN's liability for Allen and Turner's conduct. Employers are subject to strict liability for the harassing conduct of supervisory employees when the target of the supervisor's harassment experiences a "tangible employment action" at the hands of the harassing supervisor. *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 219 (3d Cir. 2017). In such circumstances, the affirmative *Ellerth/Faragher* defense is unavailable. *Id.* at 220.

Here, Albert has sufficiently demonstrated that he suffered tangible employment actions at the hands of both Allen and Turner, both of whom were his supervisors. Specifically, at the most basic level, Albert has offered evidence that Allen required him to attend early-morning meetings

and that Turner terminated his employment. From this evidence, discussed above, a jury could reasonably conclude that both Allen and Turner took tangible employment actions against Albert. Given this, while Albert's failure to report Allen and Turner may undermine the credibility of Albert's testimony, that is a question for the jury; and Albert's failure to report what he observed sooner does not on its own affect whether AHN can be liable for Allen and Turner's conduct. Accordingly, for the purposes of deciding AHN's motion for summary judgment, the Court will consider the statements and conduct of both Allen and Turner under the *respondeat superior* doctrine.

Looking across the briefing, Albert provides evidence from which a jury could find the following:

1. Allen required Albert to attend early-morning meetings because of his race. *See supra.*
2. Allen referred to a person of middle eastern descent as a "sand n*****" in Albert's presence. (Albert Dep. 149:17, ECF No. 100-3 at 39).
3. Allen told Albert that he and another Black employee were "good blacks, not n*****s." (ECF No. 117 ¶ 57).
4. Allen referred to an employee of AHN's parent company as "a nasty, lying Black woman" in Albert's presence. (ECF No. 117 ¶ 59).
5. Albert overheard Allen refer to a coworker's Black husband as "garbage." (ECF No. 117 ¶ 22).
6. Allen used the phrase "Not my circus, not my monkeys." (Albert Dep. 86-87, ECF No. 100-3 at 24; Guthrie Dep. 149-51, ECF No. 100-2 at 39-40).
7. Allen once said to Guthrie, in Albert's presence, "You better get your boy in line," with "your boy" referring to Albert. (ECF No 117 ¶ 18).
8. Allen told Albert that shopping at K-Mart and Walmart were "ghetto." (Albert Dep. 107:9-17, ECF No. 100-3 at 29).
9. Allen subjected to heightened scrutiny, particularly regarding his attendance and punctuality. (*See, e.g.*, ECF No. 117 ¶¶ 17, 42).
10. Turner "nitpicked" Albert. (*See, e.g.*, Guthrie Dep. 206:8-15, ECF No. 100-2 at 54).
11. Albert overheard Turner refer to him as a "diversity hire." (ECF No. 117 ¶ 167).
12. Turner terminated his employment because of his race. *See supra.*

Albert has also produced evidence from which a jury could also find that the following occurred:

1. Allen referred to Le'Veon Bell as a "n*****" after he didn't report to Steelers' training camp. (ECF No. 117 ¶ 36).
2. While interviewing candidates for a position, Allen ripped up the resume of a Black candidate. (ECF No. 117 ¶ 28).
3. While interviewing candidates, Allen would say things like "With a name like that . . . don't bring them in." (Paranzino Dep. 25:11-23, ECF No. 102-2 at 8).
4. Allen said, "there you go, there's another welfare baby" upon learning that the employee's granddaughter would be "half black and half white." (Sowards Decl. ¶ 10, ECF No. 102-1 at 3).

Though Albert may not have known about these latter incidents, they are still relevant to Albert's hostile work environment claim: they could support a reasonable inference that the facially neutral conduct Albert was subjected to—for example, being required to attend early morning meetings and being "nitpicked"—was racially motivated. *See Caver v. City of Trenton*, 420 F.3d 243, 264 (3d Cir. 2005).

If the jury credits Albert's evidence, it could reasonably conclude that Albert was subjected to a hostile work environment on account of his race. While some of Allen's alleged comments and conduct were not categorically race-related, some unquestionably were and was. The fact that Allen may have also acted in an abusive manner towards white employees, or made derogatory comments about other protected groups, does not immunize her or AHN from race discrimination liability. Moreover, even if Allen bullied other employees in other ways, the fact remains that a jury could conclude that Albert would not have been subjected to race-based ridicule if he were white, and therefore that Albert suffered intentional discrimination because of his race as a result of being required to work in a racially hostile work environment.

From this evidence, a jury could also conclude that the harassment Albert faced was "severe or pervasive." In making this determination, the jury must consider the "totality of the circumstances" including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably

interferes with an employee's work performance." *Mandel*, 706 F.3d at 168 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). Here, crediting Albert's evidence, the jury could readily conclude that Allen did much more than make "offhand comments" or engage in "simple teasing." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). A jury could conclude that Allen's repeated use of anti-Black slurs in conversations with Albert—even if not squarely leveled at Albert himself—was "degrading and humiliating in the extreme," *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 280 (4th Cir. 2015), and that Allen's assurance that Albert was a "good black[]" did little to temper the sting of the slur that immediately followed, and could easily be found to have amplified it.

Finally, a jury could reasonably conclude that Albert was detrimentally affected by the harassing conduct. Most clearly, Albert provides evidence from which a jury could conclude that he suffered tangible adverse employment actions at least in part as a result of this harassment: his employment was terminated. But even beyond this, Albert testified that he has spoken with a therapist about "everything that happened to me at AHN." (Albert Dep. 232:5, ECF No. 100-3 at 60). From this a jury could conclude that the environment he encountered at AHN was psychologically injurious. *Harris*, 510 U.S. at 23 ("The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive."). Accordingly, the Court will deny AHN's Motion for Summary Judgment with respect to Albert's hostile work environment claim.

At the same time, though, the Court will deny Albert's Motion for Summary Judgment on this claim. Though a jury could credit Albert's evidence, it need not do so. Throughout its briefing, AHN highlights reasons why Albert's testimony might be disbelieved. For example, AHN notes that many of Allen's alleged racial comments were not reported to HR in a timely manner, (ECF

No. 115 at 33-34), and that certain instances are disputed as to their occurrence. From this a jury could conclude that Allen did not actually say the things that Albert says she did. Moreover, a jury might credit the testimony of other AHN employees who stated that they never heard Allen make racial comments, (*see* ECF No. 121 ¶ 49), and conclude that Allen's harassing behavior, even if it occurred, was neither severe nor pervasive, nor race-based. Finally, a jury could conclude that Albert did not suffer a tangible employment action at the hands of Albert and Turner, and, therefore, that AHN can bring a successful *Ellerth/Faranger* defense. But those are exactly the kind of decisions made by juries at trial. Thus, on this claim, neither party is entitled to summary judgment.

## IV.    Guthrie's Claims

Guthrie moves for summary judgment on the elements of his retaliation claim of "protected activity, adverse action, causal connection between the protected activity and the adverse action, and . . . pretext." AHN moves for summary judgment "with respect to all counts and claims set forth by Plaintiffs in the Second Amended Complaint." (ECF No. 113). The Court denies Guthrie's motion. As it pertains to Guthrie's claims, the Court grants AHN's motion in part and denies it in part.

### A.    Retaliation

Guthrie claims that Turner terminated his employment in retaliation for his protected activity. The parties agree that the termination of Guthrie's employment constitutes an adverse action. But they disagree on what protected activity Guthrie engaged in, whether there is a causal connection between Guthrie's protected activity and his termination, and whether AHN's stated reason for terminating Guthrie is pretext for retaliation. The Court concludes that genuine disputes of material fact preclude summary judgment for either party on this claim.

### 1.    Protected Activity

Guthrie claims that he engaged in protected activity on three separate instances. (ECF No. 99 at 19). First, he claims that he complained in March 2019 to Jami Tinney—an HR representative—about Diane Allen's abusive behavior and use of racial slurs. (ECF No. 99 at 20; ECF No. 117 ¶ 53). Second, he claims that he engaged in protected activity when he reported Allen to HR after she referred to an employee of AHN's parent company as "a nasty, lying black woman." (ECF No. 99 at 20). And third, he claims that he engaged in protected activity when he refused to comply with Turner's order to write up Albert. (ECF No. 99 at 20).

Reporting discrimination and harassment to supervisors or HR is statutorily protected activity. *See, e.g.*, *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 792 (3d Cir. 2016) ("Connelly engaged in protected activity when she filed multiple complaints of sexual harassment."). At his deposition, Guthrie testified that, in March of 2019, he met with Jami Tinney—a Senior HR Business Partner at AHN—and reported to her numerous instances of Diane Allen's bullying and racist behavior. (Guthrie Dep. 129:2-142:22, ECF No. 100-2 at 34-38). AHN marshals evidence that contradicts Guthrie's account. Specifically, AHN points to Jami Tinney's testimony that she did not receive any complaints about race-related conduct or statements by Allen until May 2019. (Tinney Dep. 230:21-231:1, ECF No. 102-3 at 60). AHN also argues that there is no documentary evidence to corroborate Guthrie's claim that he met with HR in March 2019 and notes some of the documentary evidence that Guthrie cites appears to refer to conversations he had with HR in May 2019, (ECF No. 117 ¶ 53). Given the conflicting evidence on this point, the Court concludes that there's a genuine factual issue about whether Guthrie engaged in protected activity in March 2019.

There is no dispute over whether Guthrie engaged in protected activity when he reported Diane Allen's inappropriate comments in May 2019. (ECF No. 117 ¶ 60). This leaves the third instance of allegedly protected activity: Guthrie's refusal to discipline Albert.

Refusal to participate in discriminatory or retaliatory conduct is itself protected activity. *Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 277 (2009) ("And we would call it 'opposition' if an employee took a stand against an employer's discriminatory . . . by refusing to follow a supervisor's order to fire a junior worker for discriminatory reasons."). Importantly, the conduct opposed need not actually be unlawful. Rather, an employee's activity is protected so long as the employee has an objectively reasonable and good-faith belief that the conduct they are opposing is made unlawful by Title VII. *Moore v. City of Phila.*, 461 F.3d 331, 341 (3d Cir. 2006). But to be protected, the "employee's opposition must not be equivocal or vague." *Minniti v. Crystal Window & Door Sys. PA, LLC*, No. 23-3132, 2024 WL 4371534 (3d Cir. Oct. 2, 2024). The opposition "must identify the employer and the practice" and either "explicitly or implicitly" allege that the protected characteristic was the basis for the adverse employment action. *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3d Cir. 2006). In determining whether an employee's conduct is sufficiently specific, courts must be sensitive to the overall context and the "facts of each case." [23] *Id.*

---

[23] AHN claims that "to be protected 'opposition' activity, Guthrie would have had to *expressly* voice concerns about race discrimination and/or violation of the applicable laws." (ECF No. 115 at 27 (emphasis added)). AHN cites no authority in support of that interpretation of the rule. The Third Circuit has held that opposition activity may be protected if it "identif[ies] the employer and the practice—if not specifically, *at least by context*," *Curay-Cramer*, 450 F.3d at 135 (emphasis added), and that the focus of the court's inquiry is "the message being conveyed rather than the means of conveyance," *id.* Accordingly, opposition activity need not be explicit to be protected; it need only be clear. In practice, this means that where the discrimination or retaliation is overt or obvious, less is required of the employee to make the employee's opposition unequivocal. Where discrimination is more subtle or less obvious, the employee is likely required to do more to signal the reason for their opposition.

According to Guthrie's post-deposition affidavits, after being asked to discipline Albert, he told Turner that he believed Albert was being singled out because of his race. According to Guthrie's declarations, on two occasions Guthrie expressed to Turner "the unfairness of singling out Santos, the sole black leadership member" and expressed his "concerns about the disparity in treatment between the leadership team members." (ECF No. 122-2 ¶¶ 1-2). "Specifically, [Guthrie] noted that it was very difficult to explain why the rest of the white leadership team was absolved from such scrutiny, while Mr. Santos, the only Black member of the leadership team, was receiving such unfair treatment." (ECF No. 122-2 ¶ 2).

AHN protests that the Court should ignore Guthrie's affidavits as being "sham affidavits" because it says that they are inexplicably inconsistent with Guthrie's deposition testimony. In determining "whether an affidavit is a sham," the court should consider "[t]he timing of the affidavit, whether there is a plausible explanation for the contradictory statements, and whether there is independent evidence in the record supporting the affidavit." *J.R. v. Lehigh Cnty.*, 534 F. App'x 104, 108 (3d Cir. 2013) (citing *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 268-69 (3d Cir. 2010)). In the Third Circuit, "[w]hen, without a satisfactory explanation, a nonmovant's affidavit contradicts earlier deposition testimony, the district court may disregard the affidavit in determining whether a genuine issue of material fact exists." *Hackman v. Valley Fair*, 932 F.2d 239, 241 (3d Cir. 1991). Such "sham affidavits" are insufficient to create a genuine issue of material fact to prevent summary judgment. *See Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 251-53 (3d Cir. 2007).

According to AHN, Guthrie's affidavit is inconsistent with his testimony because Guthrie failed to mention "not writing up Albert" when he was asked at his deposition to identify all of his alleged protected activities. (ECF No. 115 at 26). While true that Guthrie did not *immediately*

mention his failure to write up Albert in response to the referenced question at that moment, only a few pages after the portion of Guthrie's deposition that AHN cites, Guthrie was asked, "Is there any other reason why you believe you were retaliated against other than what we've discussed already?" (Guthrie Dep. 245:9-11, ECF No. 100-2 at 63). Guthrie responded, "Well, I was retaliated against because I didn't write him up, too. I didn't write him up, so I got terminated." (Guthrie Dep. 245:12-14, ECF No. 100-2 at 63). Accordingly, his deposition testimony and affidavits are not inconsistent on this point, and the Court will consider Guthrie's post-deposition affidavits.

There is a genuine issue of material fact regarding whether Guthrie's failure to write up Albert was protected activity. The jury may believe Guthrie, that he expressed to Turner "the unfairness of singling out Santos, the sole Black leadership member" and expressed his "concerns about disparity in treatment between the leadership team members." (ECF No. 122-2 ¶¶ 1–2). If they do, the jury could reasonably conclude that Guthrie's subsequent failure to write Albert up was sufficiently clear to qualify as protected activity. On the other hand, for all the reasons AHN points out—his failure to mention this more directly at his deposition, his failure to note his opposition in emails to Turner—a jury may disbelieve Guthrie. If they disbelieve him, the jury could reasonably conclude that Guthrie never indicated "explicitly or implicitly" that he was refusing to write up Albert because he believed doing so was discriminatory. *Curay-Cramer*, 450 F.3d at 135. Accordingly, the jury could reasonably conclude that Guthrie's conduct was just too vague to constitute protected activity.

In sum, the Court concludes that there is no dispute that Guthrie engaged in protected activity in May 2019—he did. There are, however, genuine issues regarding whether Guthrie engaged in protected activity in March 2019 and January 2020.

2.    **Causal Connection**

The Court must next determine whether Guthrie's evidence is "sufficient to raise the inference that [his] protected activity was the *likely* reason" for the adverse action. *Carvalho-Grevious*, 851 F.3d at 259. Here, the Court's analysis is complicated by the fact that there are genuine factual disputes over what protected activity Guthrie engaged in.

Viewing the evidence in the light most favorable to AHN, as the Court must for the purposes of deciding Guthrie's motion, Guthrie's refusal to discipline Albert would not be protected activity, and the jury would not believe that he reported Allen to HR in March 2019. In this universe, his only protected activity is his May 2019 complaint about Allen. And Guthrie's evidence does not conclusively establish that he would not have been fired but for these complaints. *See Carvalho-Grevious*, 851 F.3d at 258.

As an initial matter, there is a genuine issue of material fact over whether Turner knew about Guthrie's protected activity. Guthrie introduced evidence that Turner knew about Allen's conduct, (ECF No. 117 ¶¶ 86, 90; Turner Dep. 57:15-19, ECF No. 101-5 at 16; Goldberg Dep. 150:20-151:9, ECF No. 100-4 at 40); that Turner knew Allen was fired because of her conduct, (Turner Dep. 52-53, ECF No. 101-5 at 15); that Turner was told to "watch her back" around Guthrie and Albert, (ECF No. 117 ¶ 87); and that Turner said that Guthrie could be "ruthless," (Turner Dep. 177:1-14, ECF No. 101-5 at 46). But Turner testified that she did not know about Guthrie's complaints against Allen. (ECF No. 121 ¶ 100; Turner Dep. 54:7-20, ECF No. 101-5 at 16). From this evidence, a jury could conclude that Turner knew about Guthrie's reports to HR, *or* a jury could conclude that Turner did not know about the activity. Viewing the evidence in the light most favorable to AHN, the jury would conclude that Turner did not know about Guthrie's May 2019 complaints. If Turner did not know about Guthrie's complaints, then she could not have

retaliated against him for making them. *See Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 415 (3d Cir. 1999). Guthrie's Motion for Summary Judgment must be denied on this basis.

At the same time, the Court is also compelled to deny AHN's Motion for Summary Judgment with respect to Guthrie's retaliation claim. Viewing the evidence in the light most favorable to Guthrie, Guthrie's refusal to discipline Albert would be protected activity. In this universe, a jury could reasonably conclude that Guthrie was terminated for his refusal to discipline Albert. AHN says as much in its opening brief, asserting that it is "undisputed" that "Turner terminated Guthrie's employment . . . after determining that he had been insubordinate for not following her directive [to discipline Albert] and that he falsely told her that he had been conferring with Human Resources Talent Engagement Partner Colleen Chmiel." (ECF No. 115 at 8). In a world in which the jury concludes that Guthrie's failure to discipline Albert *was* protected activity, the jury could also conclude that AHN's termination of Guthrie's employment was retaliatory. Accordingly, the Court will deny AHN's motion for summary judgment.

## B.    Race Discrimination

Guthrie—who is white—claims that he was discriminated against based on his association with Albert. AHN argues that it is entitled to summary judgment on this claim for two reasons. First, AHN argues that "associational discrimination" claims are limited to situations where the plaintiff has a "substantial relationship" with a person of another race, and Guthrie and Albert did not have such a substantial relationship. (ECF No. 115 at 11–12). Second, AHN argues that Guthrie cannot establish that "he was terminated under circumstances giving rise to an inference of associational race discrimination or that AHN's reasons for terminating Guthrie's employment were pretext." (ECF No. 115 at 12).

AHN's first argument for summary judgment fails because it misstates the law. In *Kengerski v. Harper*, 6 F.4th 531, 539 (3d Cir. 2021), the Third Circuit held associational

discrimination claims are "not limited to close or substantial relationships." In its reply, AHN reads *Kengerski* as holding only that "[e]mployees thus may not be discriminated against because of their interracial relationships with distant relatives such as a grand-niece." (ECF No. 123 at 2 (quoting *Kengerski*, 6 F.4th at 539)). The Court declines to adopt such an anemic reading of this precedential Third Circuit opinion. In its entirety, the paragraph cited by AHN reads as follows:

> This theory of discrimination is not limited to close or substantial relationships. While "one might expect the degree of an association to correlate with the likelihood of severe or pervasive discrimination on the basis of that association," the "degree of association is irrelevant" to whether a plaintiff "is eligible for the protections of Title VII in the first place." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 513 (6th Cir. 2009); *accord Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 884 (7th Cir. 1998). Employees thus may not be discriminated against because of their interracial relationships with distant relatives such as a grand-niece.

*Kengerski*, 6 F.4th at 539. The rule applied by the Third Circuit is found in the paragraph's topic sentence: "This theory of [associational] discrimination is not limited to close or substantial relationships." As indicated by the court's use of the word "thus," the final sentence of the paragraph is the court's conclusion, reached by applying the operative rule of law (*i.e.*, "this theory of discrimination is not limited to close or substantial relationships") to a particular set of facts (*i.e.*, the plaintiff claimed that she was discriminated against on the basis of her relationship with her grand-niece).[24]

---

[24] In Reply, AHN also cites to *Stevens v. Bryn Mawr Tr. Co.*, No. CV 19-2418, 2022 WL 15534889 (E.D. Pa. Oct. 27, 2022), a case decided after *Kengerski*, as evidence of *Kengerski*'s holding is more limited than it might seem. The Court is not persuaded. First, the *Stevens* court does not cite to the Third Circuit's opinion in *Kengerski*; rather it cites to the district court opinion that *Kengerski* reversed. *Id.* at *5. And second, the *Stevens* court's statement of the law cannot be squared with the Third Circuit's clear statement in *Kengerski*. *Compare id.* ("[A]ssociational discrimination claims are limited to causes of action that 'involve more substantial relationships.'") *with Kengerski*, 6 F.4th at 539 ("This theory of discrimination is not limited to close or substantial relationships."). This Court is bound by Third Circuit precedent.

AHN's second argument fairs better. AHN says that Guthrie was terminated "for insubordination, lying to his supervisor, and breaching trust." (ECF No. 115 at 7). According to AHN, Guthrie was instructed to draft talking points for Albert in consultation with HR. According to AHN, Guthrie intimated to Turner that he had done so, but, in reality, he had neither consulted with HR nor drafted the talking points. (ECF No. 121 ¶¶ 77–83). Though not organized this way, Guthrie marshals six primary arguments for why a jury could conclude that AHN's stated reason is pretextual. But in the Court's estimation, Guthrie's arguments and evidence fail to undermine AHN's stated rationale. Moreover, even to the extent that Guthrie successfully pokes holes in AHN's story, he fails to demonstrate AHN's stated rationale is pretext for discrimination. In other words, AHN says that Guthrie fails to marshal evidence from which a jury could conclude that his association with Albert was the motivating or determinative cause of his termination.

First, Guthrie argues that his termination was not supported by proper documentation. According to Guthrie, he never received a termination letter, and no witness statements were gathered to support his firing. (ECF No. 99 at 26). But while Guthrie may not have received a termination letter, there is contemporaneous documentation—emails among Turner, Chmiel, and Crowell—confirming their reasons for terminating Guthrie's employment. (*See* Def.'s Ex A, AHN001612, AHN001620-22, ECF No. 118-1 at 55-58). Moreover, the absence of witness statements has an obvious explanation: Turner and Chmiel did not need to collect witness statements regarding Guthrie's misconduct because they were the witnesses, having witnessed Guthrie's purported misconduct first-hand. Guthrie also does not present evidence that it was a practice or policy to obtain statements from third-party witnesses to support an employee's termination.

Second, Guthrie argues that the stated reason for his termination—breaching trust—is a subjective evaluation that's susceptible to abuse and likely to mask pretext. (ECF No. 99 at 27 (citing *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 320 (3d Cir. 2000)). According to Guthrie, "Ms. Turner stated she did not trust Mr. Guthrie without clear justification." (ECF No. 99 at 27). While "breaching trust" might be vague or subjective in isolation, it's not vague here. On January 29, 2020, Guthrie told Turner that he "connected with Colleen [Chmiel] yesterday on this [talking points for Albert]." (ECF No. 121 ¶ 77). Turner then asked Chmiel if she connected with Guthrie about this, and Chmiel wrote back that, while they did connect that day, "at no point in the conversation nor via email have ever discussed concerns surrounding Santos. That I know 100%." (Def.'s Ex. A, AHN001620, ECF No. 118-1 at 56). At his deposition, Guthrie himself admitted nearly as much, stating that he did not "have a substantive discussion [with Chmiel] about Mr. Albert." (ECF No. 121 ¶ 78). So contrary to Guthrie's contention, based on Guthrie's own testimony, Turner did have a clear justification for distrusting Guthrie: as far as she could tell, Guthrie lied to her. In this context, "breaching trust" is not akin to the subjective qualities (*e.g.*, initiative and judgment, drive, or enthusiasm) that may mask pretext. *Goosby*, 228 F.3d at 320-21.

Third, Guthrie argues that the termination of his employment but not that of others is evidence of selective enforcement of AHN's policies and therefore evidence of pretext. (ECF No. 99 at 27 (citing *Carroll v. Guardant Health, Inc.*, 511 F. Supp. 3d 623, 646-47 (E.D. Pa. 2021)). Specifically, Guthrie argues that "Mr. Morelli lied to Ms. Turner and was not terminated while Mr. Guthrie [was] terminated for alleged lying." (ECF No. 99 at 27). As an initial matter, Morelli is not a proper comparator. "An employee who holds a different job title or works in a different department is not similarly situated." *Qin v. Vertex, Inc.*, 100 F.4th 458, 474 (3d Cir. 2024). Morelli

was a manager, (Goldberg Dep. 22:24-23:1, ECF No. 100-4 at 8); Guthrie was a director, (ECF No. 117 ¶ 24).

But, even if they were valid comparators, the different treatment they received does not suggest that Guthrie was singled out because of his association with Albert. From the record, it appears that Guthrie and Albert were associated with one another because of (1) their common prior employer (Ibex), (2) their common complaints against Allen, and (3) Guthrie's refusal to write up Albert. (*See* ECF No. 119 at 4; Goldberg Dep. 114:5-19, ECF No. 100-4 at 31). Bracketing Guthrie's refusal to discipline Albert, Morelli was equally associated with Albert. Morelli also worked at Ibex, and other AHN employees associated him with Albert and Guthrie because of this. (Goldberg Dep. 114:5-19, ECF No. 100-4 at 31). Moreover, Morelli also complained to HR about Allen. (*See* ECF No. 121 ¶¶ 34-35).

To the extent that Guthrie's discrimination claim rests on his association with Albert as manifested through failure to discipline Albert, this claim is more properly brought as a retaliation claim. Every person who opposes unlawful discrimination against another becomes associated, to some degree, with the target of that discrimination, but the law treats those claims differently. Given that discrimination and retaliation are prohibited by separate statutory provisions, each with robust bodies of case law, the Court is hesitant to adopt an interpretation of one that would displace the other. *See Williams v. Taylor*, 529 U.S. 362, 404 (2000) ("It is, however, a cardinal principle of statutory construction that we must give effect, if possible, to every clause and word of a statute." (cleaned up)).

Fourth, Guthrie claims that there are contradictions in timing. Turner testified that there was a week-long investigation into Guthrie's conduct, but Chmiel testified that Guthrie was only suspended for one day prior to termination. (ECF No. 99 at 28). The Court does not see why this

inconsistency matters, or why it would be material. It does nothing to contradict the "core facts undergirding . . . [AHN's] reason for terminating him." *Hennessey v. Dollar Bank, FSB*, 833 F. App'x 961, 966 (3d Cir. 2020); *Klimek v. United Steel Workers Loc. 397*, 618 F. App'x 77, 80-81 (3d Cir. 2015).

Fifth, Guthrie claims that Turner selectively forwarded emails to Chmiel on January 29, 2020, to create a false narrative of insubordination. (ECF No. 99 at 25-26). Specifically, Guthrie argues that when Turner reached out to Chmiel to ask if Guthrie had been in touch to discuss Albert's performance, she omitted two emails, one from Turner to Guthrie and one from Guthrie to Turner. In the first, Turner wrote:

> I know. I also think this could be more of a conversation that is just documented on your end - I know he's trying and I don't want to discourage the effort but the same time, the timing is appropriate. I think he will be receptive. I just talked to him this morning - great talk and good perspective. I want to really get to a point that we work as a team.

(ECF No. 122-5 at 2). In the second, Guthrie responded:

> I agree, and I do see the effort and actually feel that he's receptive, and I was really worried about that. I will be honest, I know change takes time but since you've been here, there's already been clear movement from an Operational perspective, lots of work to do but the teams interactions and communication has improved greatly, and that comes from the top so thank you.

(ECF No. 122-5 at 2). Guthrie claims that these "omitted communications indicated that Ms. Turner and Mr. Guthrie intended to coach Mr. Albert, not initiate formal disciplinary action." (ECF No. 99 at 22). The Court does not see how this could be found to be so. Guthrie had been asked to draft talking points for Albert. The Court fails to see how this is different from "a conversation that is just documented on your end." But in any case, this does nothing to contradict the "core facts undergirding . . . [AHN's] reason for terminating him." *Hennessey*, 833 F. App'x at 966. Even if Turner had decided that Guthrie should only provide Albert with documented coaching,

the undisputed fact remains that Guthrie told Turner that he had connected with Chmiel about this, but he in fact had not. Guthrie did not "have a substantive discussion [with Chmiel] about Mr. Albert," (ECF No. 121 ¶ 78), and yet he intimated to Turner that he had.

And sixth, Guthrie argues that the process by which his employment was terminated was unusually swift. Undisputed facts show that Guthrie emailed Turner on January 29, 2020, intimating that he connected with Chmiel regarding talking points for Albert when he had in fact not, (ECF No. 121 ¶¶ 77-79); that Guthrie was suspended on January 30 at 10 AM, (ECF No. 117 ¶ 119); and his employment was terminated on February 3. (ECF No. 121 ¶ 84). According to Guthrie, this process was unusually swift because (a) AHN's investigation into Allen's conduct took longer, and Allen was not suspended for the pendency of the investigation, and (b) it deviated from AHN's ordinary practice of progressive discipline.

The comparison to Diane Allen is of little to no value. To be a relevant comparator, the employee must be similarly situated in "all material respects." *Qin*, 100 F.4th at 474 (quoting *In re Tribune Media Co.*, 902 F.3d at 403). The proposed comparator must have dealt with the same supervisor, been subject to the same standards, and engaged in the same conduct. *In re Tribune*, 902 F.3d at 403. Guthrie and Allen did not have the same supervisor. Turner and Chmiel decided to terminate Guthrie's employment. (*See* ECF No. 117 ¶ 128; ECF No. 121 ¶ 83). Kenyokee Crowell decided to terminate Allen's employment. (ECF No. 121 ¶ 55).

Allen and Guthrie also engaged in different conduct. Guthrie was allegedly insubordinate; Allen allegedly made discriminatory and harassing comments. While the Court—or the jury—may have opinions about what conduct is more severe, it is not the Court's or the jury's role to determine what kind of misconduct merits swifter action. *See Klimek*, 618 F. App'x at 80 ("[Courts]

are not 'a super-personnel department' tasked with correcting unduly harsh employment actions; we are instead concerned with whether the reasons for such actions are pretextual.").

Putting the severity of the misconduct aside, the fact that the investigation into Allen's misconduct took longer than that into Guthrie's has an obvious explanation. It does not appear from the record that Crowell—the ultimate decisionmaker—was present when Allen made the discriminatory comments. (*See* ECF No. 117 ¶ 59). Accordingly, a more substantial investigation was needed to confirm the underlying facts. In Guthrie's case, however, the relevant decisionmakers—Turner and Chmiel—were able to quickly confirm the factual basis for Guthrie's misconduct because they had witnessed it themselves. In short, the situations simply are not comparable.

Guthrie's other argument that the termination of his employment was unusually swift— that AHN deviated from its standard practice of progressive discipline—fairs no better. As AHN point outs, Guthrie's termination wasn't a technical violation of AHN's progressive discipline policy. That policy clearly provides that AHN can move for immediate termination, if appropriate under the circumstances, so the policy itself does not require discipline to be methodical or "progressive."

Looking at the evidence as a whole and viewing it in a light most favorable to Guthrie, the Court concludes that Guthrie has not marshaled evidence from which a jury could conclude that AHN's stated reasons for terminating Guthrie's employment—insubordination, lying to his supervisor, and breaching trust—were merely pretext for associational discrimination. Accordingly, the Court will grant AHN's Motion for Summary Judgment with respect to Guthrie's race discrimination claim.

### C.     Hostile Work Environment

Guthrie does not move for summary judgment on his hostile work environment claim. (*See* ECF No. 97). The Court therefore must view the evidence in the light most favorable to the non-movant, and accordingly, the Court denies AHN's Motion for Summary Judgment with respect to Guthrie's hostile work environment claim.

To succeed in his association-based hostile work environment claim, Guthrie would need to prove that (1) he suffered intentional discrimination because of his association with Albert, (2) the discrimination was severe or pervasive, (3) the discrimination detrimentally affected him, (4) the discrimination would have detrimentally affected a reasonably person in like circumstances, and (5) *respondeat superior* liability existed. *Castleberry*, 863 F.3d at 263; *Kengerski*, 6 F.4th at 538–40.

In its briefing, AHN asserts several reasons why it is entitled to summary judgment. The first is that Guthrie did not have a substantial relationship with Albert. That argument fails for the reasons discussed above: associational discrimination claims are not limited to close or substantial relationships. *Kengerski*, 6 F.4th at 539 ("This theory of discrimination is not limited to close or substantial relationships."). AHN also argues that Guthrie's hostile work environment claim fails because Guthrie did not identify harassing comments or conduct that was directed at him; that Allen's and Turner's conduct was not severe and pervasive; that the conduct did not detrimentally affect him as a matter of law; and that the conduct would not have detrimentally affected a reasonable person in Guthrie's position.

Guthrie's evidence regarding the hostile work environment falls into three buckets. First, Guthrie offers evidence of Diane Allen's discriminatory comments and conduct directed at others, catalogued in detail above. (*See* ECF No. 119 at 17-18). Second, Guthrie offers evidence that he felt the need to—and did—take steps to protect Albert from the Allen and Turner's discriminatory

behavior. (ECF No. 119 at 18). Specifically, he noted on instance in which he felt compelled to purchase gift cards for Albert's employees to shield Albert from criticism. (Guthrie Dep. 105:3-106:4, 182:25-183:22, ECF No. 100-2 at 28-29, 48). And third, Guthrie testified that he and Albert were subjected to heightened scrutiny by Turner. (Guthrie Dep. 110, ECF No. 100-2 at 30).

A hostile work environment claim turns on whether an employer or its responsible officials have created a work environment that is "permeated with discriminatory intimidation, ridicule, and insult" based on one or more characteristics set out in Title VII or covered by Section 1981. *Harris*, 510 U.S. at 21 (cleaned up). Guthrie certainly offers evidence that Allen made discriminatory comments and that he witnessed a number of them firsthand, but AHN says that it is entitled to judgment in its favor because he does not offer evidence that these comments were directed towards him, towards those with whom he shared a protected characteristic, or towards others who associated with Black individuals.

AHN also argues that Guthrie has not advanced evidence suggesting that Allen made these comments in his presence because of his relationship with Albert, or that he believed that these comments were directed towards him because of his relationship with Albert. While these comments certainly remain relevant—*e.g.*, to help demonstrate the discriminatory intent behind facially-neutral harassing conduct directed at Guthrie—AHN argues that they do not themselves constitute intentional discrimination against Guthrie because of his association with Albert. *See Caver*, 420 F.3d at 263-64; *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 518 (6th Cir. 2009) ("While these [remarks] . . . were highly offensive toward African-Americans, and while two of the comments referred specifically to friends of [plaintiff's], none of them was directly harassing toward [plaintiff]."); *Newman v. Point Park Univ.*, No. 2:20-CV-00204, 2022 WL 969601, at *26 (W.D. Pa. Mar. 31, 2022) (dismissing hostile work environment claim in part because plaintiff did

not allege that hostile acts were taken "because of" plaintiff's protected characteristic); *contra Kengerski*, 6 F.4th at 540 (noting that plaintiff had reasonable belief that he was subjected to a hostile work environment because he has a basis to conclude that racist comments "were at least in part directed at him").

In the Court's judgment, AHN's arguments rely on an overly cabined view of Guthrie's claim, the application of the involved legal principles to those claims, and the record before the Court. In the operative pleading, the Second Amended Complaint, (ECF No. 33), Guthrie states his hostile work environment claim as being shaped by Guthrie being closely associated with Albert (a fact that the jury could find and could find to have been obvious to Allen); that Guthrie's work environment (the "terms and conditions" of his employment) were altered by Allen's racially-focused conduct; and that Guthrie was harmed by this conduct.

Some courts have concluded that being generally subjected to a racially hostile workplace does not support a hostile work environment claim unless the hostility is directed at the person advancing such a claim or when that person carries the characteristics under attack in the workplace. *See Bermudez v. TRC Holdings, Inc.* 138 F. Ed 1176, 1180 (7th Cir. 1998); *Jackson v. Deen*, 959 F. Supp. 2d 1346, 1350 (S.D. Ga. 2013); *Blake v. Penn State Univ. Greater Allegheny Campus*, No. CIV.A. 09-1182, 2011 WL 841374, at *11, n.8 (W.D. Pa. Mar.8, 2011); *Longoria v. New Jersey*, 168 F. Supp. 2d 308, 318 (D. N.J. 2001); *Zielonka v. Temple Univ.*, No. Civ. A. 99-5693, 2001 WL 1231746 (E.D. Pa. 2001); *Neshaminy Sch. Dist v. Pennsylvania Hum. Rels. Comm'n*, 257 A. 3d 766, 789 (Pa. Commw. Ct. 2021).

But other courts have come out the opposite way, concluding that even where the racially hostile conduct is directed toward an employee other than the one advancing the hostile work environment claim, liability may still lie as to the complaining employee if the employee

advancing the claim can demonstrate an injury in fact arising from the challenged conduct. *See Clayton v. White Hall Sch. Dist.*, 875 F. 2d 676, 679–80 (8th Cir. 1989); *Moore v. Lower Frederick Twp.*, No. CV 20-5920, 2022 WL 657068, at \*10 (E.D. Pa. Mar. 4, 2022).

The Supreme Court has determined that it is not sufficient for such plaintiffs to simply allege injury based on "the lost benefits of associating with persons of other racial groups." *FCS Advisors, LLC v. Missouri*, No. 2:17-CV-04089-NKL, 2017 WL 4639026, at \*6 (W.D. Mo. Oct. 16, 2017), *aff'd*, 929 F.3d 618 (8th Cir. 2019); *see Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 176–77 (2011). But Guthrie's claim is not based solely on a deprivation of association with Black employees. His claim alleges tangible harms that he incurred due to his association with Albert, a Black employee. This type of claim is sanctioned by the Third Circuit's association-based Title VII jurisprudence.

In the Court's estimation, in light of what Guthrie has pled his harm to be, the question boils down to whether a rational jury properly instructed can conclude that Guthrie's terms and conditions of employment were altered by the conduct of someone for whose conduct AHN could be found to be responsible. On this record, and construing the facts in the light most favorable to Guthrie as the non-movant here, the Court concludes that a jury could. Here's why.

First, if the jury were to believe the evidence marshaled and advanced by Albert and Guthrie relative to Allen's workplace communications and conduct, they would have before them about as stark a picture of outright racial bigotry as one might imagine, one that goes way beyond being described as mere insensitivity or "loose talk," "stray remarks," or any similar benign formulation. And a jury could well find that that conduct was so persistent and racially intimidating that it was both severe and pervasive.

Second, on the record before the Court, a jury could readily find that Guthrie and Albert were associated with one another in a meaningful way and that such was well known in the AHN workplace, including by Allen.

Third, that same jury could reasonably conclude that Allen, knowing all of that, would also well know that her actions and conduct toward Black employees, particularly Albert, would negatively impact Guthrie, in the very ways that he pleads in the Second Amended Complaint. In a similar vein, that Guthrie took steps to protect Albert, if found by the jury, would be some further evidence that as a result of Allen's conduct, Allen (and therefore AHN) would have well known that those actions were actually and negatively impacting Guthrie, and therefore could constitute intentional discrimination against Guthrie. While Guthrie does not present direct evidence of an intention by Allen or Turner to impose these burdens on Guthrie, there is evidence from which a jury could conclude that such was the natural, probable, actual and known consequences of their actions. Take the gift cards, for example. Guthrie bought gift cards for Albert's whole team after Allen asked Guthrie if Albert purchased holiday gifts for his team. (Guthrie Dep. 183:17-22, ECF No. 100-2 at 48). Guthrie testified that he was not "required" or "ordered" to take these actions, but rather that he bought these gift cards because he did not know if Albert could afford to do so and because he felt it would be held against Albert if Albert did not provide gifts to his team. (Guthrie Dep. 183:25-184:3, ECF No. 100-2 at 48). While in one formulation this episode demonstrates intentional discrimination with the target of this discrimination being Albert, not Guthrie, at the same time, the jury could conclude that the conditions of Guthrie's employment were intentionally altered by Allen because of Albert's race and Guthrie's association with Albert. In other words, Guthrie's evidence could be found to demonstrate that he witnessed and attempted to protect Albert from overt racial discrimination, and that because Allen would have been plainly

aware of this consequence of her actions and persisted anyway, Guthrie therefore suffered intentional discrimination at her hands himself.

To determine whether the harassing conduct is sufficiently extreme, courts consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Mandel*, 706 F.3d at 168 (citation omitted).

The record does not reflect specific instances of enhanced scrutiny directed at Guthrie, beyond conclusory statements. Guthrie testified that "Melissa Turner was conducting investigations that she wasn't doing with other departments." (Guthrie Dep. 110:1-3, ECF No. 100-2 at 30). He explained that Turner told him he was "doing Santos [Albert]'s job" and that his supervisors "attempted to get [him] to write [Albert] up in an unprecedented process." (Guthrie Dep. 110:4-13, ECF No. 100-2 at 30). Aside from those two examples, though, Guthrie does not explain how excessive scrutiny of him by AHN supervisors manifested.

But as for the conduct allegedly directed at others, Allen's use of derogatory language and racial slurs is offensive without a doubt, and on the record here, the jury could find that it was anything but random, episodic, or cryptic. For starters, the n-word is "odious" and "far more than a mere offensive utterance." *Thomas v. Bronco Oilfield Servs.*, 503 F. Supp. 3d 276, 299–300 (W.D. Pa. 2020) (compiling cases). The sting of this slur is unquestionably greater for those in the group against whom it is hurled, but Guthrie testified that he was "humiliated" and "embarrassed" by the fact that Allen felt "comfortable speaking like this in front of [him]." (Guthrie Dep. 295:12-14, ECF No. 100-2 at 76). At the same time, given the alleged breadth and persistence of Allen's use of the "n-word" and a multitude of its derivations along with a bevy of other racially demeaning

76

constructs, in Guthrie's presence and her knowing of his relationship with Albert, the jury could readily find that Allen's conduct in the presence of Guthrie was calculated on her part and aimed at Guthrie because of the relationship he had with Albert. The jury could thus find that Guthrie's terms and conditions of employment were altered.

AHN for its part can and does point to record evidence from which it might be concluded that Guthrie was not treated unfavorably at all. At his deposition, Guthrie testified that he felt that his "integrity was going to be called into question" if he continued working at AHN because he was a *beneficiary* of AHN's culture of favoritism, not a victim of it. (Guthrie Dep. 296:14-19, ECF No. 100-2 at 76 ("I was concerned because of the environment and because of the culture of the favoritism, the friends who get promoted. Even what happened with me. I got promoted and I didn't even apply."); *see id.* 299:6-16, ECF No. 100-2 at 77 (Q: "Were white managers treated better than Mr. Albert?" A: "I feel they were." Q: "Why do you feel that way?" A: "That's including myself. Because I didn't have to worry about the same things he did. I could probably say the exact things as him in a harsher way and not get scrutinized and not be pulled in the office and not be put on a PIP.")).

But viewing the evidence as a whole as the Court must, Guthrie has advanced evidence from which a jury could conclude that Allen in particular created and fostered a workplace environment that was permeated with racially inflammatory commentary and invective, that it was so persistent that it had become severe and pervasive, that her generation of that workplace environment had a detrimental and negative impact on Guthrie to the degree that it altered the terms and conditions of his employment, that she was well aware of Guthrie's relationship or association with Albert and proceeded as she did to the degree that she did well aware of the detrimental impact it would have on Guthrie. That jury could rationally conclude that Guthrie's

reaction to that workplace environment was reasonable, and that AHN was accountable for it. Therefore, AHN's Motion for Summary Judgment on Guthrie's hostile work environment claim will be denied.

## V.    Mitigation of Damages

Lastly, Albert and Guthrie also move for summary judgment on the issue of whether they have mitigated their damages. "An unemployed or underemployed claimant, like all other Title VII claimants, is subject to the statutory duty to minimize damages. . . . This duty, rooted in an ancient principle of law, requires the claimant to use reasonable diligence in finding other suitable employment." *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231 (1982). Though the plaintiff has the legal duty to mitigate damages, it is the defendant who must prove failure to mitigate. *Robinson v. Se. Pa. Transp. Auth., Red Arrow Div.*, 982 F.2d 892, 897 (3d Cir. 1993). To prove failure to mitigate, the defendant must demonstrate either (1) that the plaintiff "withdrew entirely from the employment market," or (2) that (a) other substantially equivalent positions were available and (b) plaintiff failed to "use reasonable diligence in attempting to secure those positions." *Caufield v. Ctr. Area Sch. Dist.*, 133 F. App'x 4, 10-11 (3d Cir. 2005); *Booker v. Taylor Milk Co.*, 64 F.3d 860, 864 (3d Cir. 1995). Importantly, "a discrimination claimant's efforts need not be successful." *Caufield*, 133 F. App'x at 12. Rather, she must only "exercise good faith in attempting to secure a position." *Id.*

Although the Court agrees with Plaintiffs that AHN has proffered little evidence about their failure to mitigate damages and AHN has not moved for a continuance pursuant to Fed. R. Civ. P. 56(d), the Court concludes that Plaintiffs' Motion is premature on this point. As a matter of case management, "it makes little sense to separate the issue of when and whether plaintiff mitigated her damages from trial-phase questions concerning the amount of her damages as a whole." *Siam*

*v. Potter*, No. C 04-0129, 2005 WL 8166268, at *17 (N.D. Cal. May 17, 2005); *In re Smith & Nephew Birmingham Hip Resurfacing (BHR) Hip Implant Prods. Liab. Litig.*, No. 1:17-CV-00944, 2021 WL 7186286, at *16 (D. Md. May 17, 2021) ("Though Smith & Nephew has so far failed to proffer evidence that would support a defense of failure to mitigate, this issue is better addressed in connection with jury instructions in the context of trial.").

Accordingly, the Court will dismiss without prejudice Plaintiffs' Motion as it relates to Plaintiffs' failure to mitigate damages.

## VI.    Conclusion

The Court will dismiss without prejudice Plaintiffs' Partial Motion for Summary Judgment as to AHN's affirmative defense that Plaintiffs failed to mitigate their damages, and deny Plaintiffs' Motion in all other respects.

The Court will grant Defendants' Motion for Summary Judgment as to the following claims:

- Albert's Race Discrimination Claims under Title VII, Section 1981, and PHRA arising out of the denial/delay of a promotion, the denial of a bonus, the denial of training, and assignment to the late shift;
- Albert's Retaliation Claims under Title VII, Section 1981, and PHRA;
- Guthrie's Race Discrimination Claim under Section 1981;

In all other respects, Defendant's Motion for Summary Judgment will be denied. The claims that survive for trial are:

- Albert's Race Discrimination Claims under Title VII, Section 1981, and PHRA arising out of the requirement that he attend early morning meetings and the termination of his employment;
- Albert's Hostile Work Environment Claims under Title VII, Section 1981, and PHRA.
- Guthrie's Retaliation and Hostile Work Environment Claims under Section 1981.

An appropriate Order shall issue.

s/ Mark R. Hornak
Mark R. Hornak
United States District Judge

Dated: January 29, 2026